Argued July 23, decided July 30, rehearing denied Oct. 1, 1912.

### SHERRED *v.* CITY OF BAKER.

(125 Pac. 826.)

**Waters and Water Courses—Riparian Rights—Nature of Rights.**

1. It is the use of water, and not the water itself, to which one may acquire a property right.

**Waters and Water Courses—Riparian Rights—Right of Lower Riparian Owner.**

2. At common law a riparian owner diverting water for his own uses was bound to let it pass to the lower owner undiminished in quantity and quality, except as it was naturally consumed by the use for which it was taken.

**Waters and Water Courses—Public Water Supply—Rights as Between City and Lessee.**

3. A municipal charter (Special Laws 1903, p. 595) provided that the city might purchase, take by gift, or acquire real and personal property for municipal purposes, with power to manage, lease, or otherwise dispose of the same; and the city council was empowered to provide the city with water, and to erect waterworks within or without the city limits, to manage such waterworks, and to establish rates for the city or residents in the vicinity of the waterworks outside the city. Laws 1911, p. 121, declared that a city operating a system of waterworks might sell or supply water to any person within or without its limits. The city acquired priority and superiority of right to the use of waters of a creek, and permitted plaintiff to divert

a certain amount therefrom for irrigation, and thereafter, and before it had made actual use or connections for use for municipal purposes, leased the same water right to others outside the city, destroyed plaintiff's dam, and refused to allow her to divert any water from the creek. Held, that the main purpose of the charter was to provide water for city use by conducting the waters of the creek to the city, and that before an actual connection and use the city was in the position of a private owner, without right to lease it to others, and so deprive plaintiff of her use under the permit.

From Baker:  WILLIAM SMITH, Judge.

Statement by MR. JUSTICE BURNETT.

This is a suit by Florence L. Sherred against the City of Baker, a municipal corporation, Chas. L. Palmer, mayor commissioner of the City of Baker, a municipal corporation; Anderson Finley, commissioner of department No. 2 of the City of Baker, a municipal corporation, and George W. Henry, commissioner of department No. 3 of the City of Baker, a municipal corporation.

The essence of the complaint is that the defendant city, a municipal corporation, about the year 1900, for the purpose of ultimately increasing its water supply, acquired by purchase sundry miners' appropriations of the waters of various creeks tributary to Powder River, in Baker County. These appropriations dated back and took effect since the year 1866, and included 400 inches, miners' measurement, under a six-inch pressure, of the waters of Goodrich Creek. The grievance of the plaintiff is that, although she has a permit, under date of April 8, 1910, from the State Engineer, to divert upon her land in Baker County from that creek 80 miners' inches of water under six-inch pressure, for the purpose of irrigating her land, and although the city has not yet diverted into its pipe line or conducted into the city any of those waters, it refuses to allow her to divert any of that creek, has destroyed her dams and ditches, and, on the contrary, has leased the use of the water in question to other parties in her neighborhood, who have no right whatever

in the creek, either by appropriation or otherwise, except as lessees of the city. In brief, she claims the right to use the water to the extent permitted by the State Engineer until the city shall actually conduct the waters of Goodrich Creek within its municipal boundaries for the use of its inhabitants. She acknowledges the superior title of the city to the ultimate use of the water, but claims the right to use it herself, to the extent mentioned, as against the lessees of the city, and asserts, not only that the leasing of the water to her neighbors is not within the authority of the city, but also that it is not such a use as is contemplated by law on the part of the city, so as to prevent her enjoyment of the same.

After sundry admissions and denials, the defendant city interposed four affirmative defenses. By the first it asserted corporate powers for that purpose, and averred that it purchased the prior appropriations of the miners about January 29, 1900, and immediately thereafter began a system of improvements of its then water system, designing to extend it ultimately to include the waters of Goodrich Creek, and that meanwhile it has put the water to a beneficial use at all times. By the second defense it avers an independent appropriation on behalf of the city by its mayor and auditor, and the expenditure of a sum of about $10,000 in constructing improvements designed to finally conduct the waters of Goodrich Creek into the city limits for municipal purposes. The substances of the third defense is that, being the owner and in possession of the miners' appropriations, before mentioned, together with the ditches used formerly by the miners, the city leased these rights to certain persons mentioned, and that those lessees have put the water to a beneficial use, paying an agreed rental to the city for that purpose, and that for 30 years past the waters of Goodrich Creek, to the amount of 400 inches, have flowed and been accustomed to flow each and every year in the same ditches and ditch rights. The substance of the

fourth separate defense is the title by prescription in the waters in contest here.

The plaintiff interposed a general demurrer to each of these defenses. Pending the hearing and consideration of these demurrers, and for the purpose of construing the pleadings of this suit and making them definite and certain as to any rulings which the court might make thereon, the parties entered into a written stipulation as follows:

"(1) Goodrich Creek is a perennial stream in Baker County, Oregon, flowing in an easterly direction from a spur of the Blue Mountains to Powder River. Such creek lies at points and places material to this case about eight or ten miles northwest and outside of the corporate limits of the City of Baker. Between Goodrich Creek and the city, and running in the same direction and lying south thereof, are certain other creeks, named Mill, Marble, Big Salmon, Little Salmon, and Elk creeks; the latter being nearest to the corporate limits of the city.

"(2) In the years 1900 and 1901 the defendant city acquired by purchase, through good and sufficient deeds thereto, the rights of certain mining interests to the waters of Goodrich Creek to the extent of 400 miners' inches, which was and is the normal flow of the creek; and such rights so acquired were valid and legal rights to the waters of said stream under an appropriation thereof dating from the year 1867, and such deeds conveyed to the defendant city a good and valid title to such water and water rights at the time of the execution thereof.

"(3) The defendant city acquired such rights and ditches through which they had been used prior to that time in furtherance of a general plan looking toward the acquisition of a larger water supply than it had at that time, anticipating and expecting that it would be required for future needs of the city.

"(4) At the time of the purchase of said rights and ditches, the city supply, so far as the creeks above named are concerned, was confined to the waters of Elk Creek only, and that at the same time the city purchased and acquired the ditches and water rights of Goodrich Creek, included in the same purchase, it also purchased certain

other water rights in and to the waters of Little Salmon, Big Salmon, Marble, and Mill creeks, and immediately thereafter proceeded to extend its water system north from Elk Creek to tap the waters of such creeks in which it acquired its new rights at the same time that it acquired its rights in and to the ditches and water rights of Goodrich Creek, above described.

"(5) The pipe line of the defendant city which was used to convey the waters of Elk Creek to the city reservoirs was tapped and extended around the brow of the mountain in a northerly direction, and tapping and diverting the waters of Little Salmon, Big Salmon, and, some years later, still further to and tapping the waters of Marble Creek; but the ditch and pipe line by which the city is supplied with water has never been extended beyond Marble Creek to include in the city's water supply any of the waters of Goodrich Creek in controversy in this suit, and none of the waters of Goodrich Creek have ever been conveyed to or within the corporate limits of the defendant city.

"(6) Goodrich Creek lies some four miles to the north of Marble Creek, and running east and parallel thereto. Shortly after the purchase of 1900 and 1901 of such old rights and ditches out of Goodrich Creek, the defendant city expended something like $10,000 in constructing a reservoir at the head of Goodrich Creek and making a beginning on ditches out of Goodrich Creek south towards Marble Creek, having in mind the connecting up of Goodrich Creek and the reservoirs so constructed with Marble Creek and the city's ditch and pipe line at that point; but this work was never carried out, and no water has ever been impounded in the reservoir, and the beginning of the ditch that was made out of Goodrich Creek has never been used for the purpose of carrying water.

"(7) At the time of the construction of the reservoir, the city, by its mayor and auditor, pursuant to ordinance, made a water location on Goodrich Creek to the extent of 500 inches, miners' measure. This seems to have been done by way of and for the purpose of enlarging the rights of the city in and to the waters of said creek to which the city had succeeded by purchase. The construction and work of said reservoir succeeded this location within a short and reasonable time thereafter. The normal flow

of Goodrich Creek during the irrigating season does not exceed 400 inches, miners' measurement, and the location of the city could not cover any water in addition to that which the city acquired by purchase during the irrigating season.

"(8) Each and every year since the city acquired such rights through such deeds it has leased the waters of Goodrich Creek for either mining or irrigation purposes, and such waters, for each and every year, were put to a beneficial use by the lessees; and in May, 1909, the city executed a lease of all its water interests in Goodrich Creek to certain farmers for irrigation, stock, and domestic purposes, to be used on their lands lying under the ditches diverting the waters thereof, and such waters have been so used. This lease does not expire until May, 1914; and it was in defense of this lease and the claimed rights to turn all the waters of said creek to such lessees for such purposes that the city, during the last irrigation season, came in conflict with the rights plaintiff claims to the use of such waters. Plaintiff had the option to join in this lease as one of the lessees, but did not do so.

"(9) Such farmers live near Goodrich Creek, and are neighbors of plaintiff. The city has, pursuant to such lease, diverted all the waters of such creek above the lands of plaintiff in the same manner and by the same methods and means that such waters were diverted for mining purposes by the predecessors in interest of defendant city, and to the same extent, and conducted the waters therefrom down to and upon the lands of the farmers from the same points and through the same ditches as were used by the predecessors in interest of the city, and all of said ditches lying above the lands of plaintiff: and ever since the purchase of said water rights the defendant city has exercised dominion and control over said water rights and asserted ownership thereto as against all persons, including plaintiff.

"(10) The only beneficial use the city has ever made of the waters of Goodrich Creek has been their sale and lease to such farmers and other persons for such purposes. Goodrich Creek has never been connected with the ditches and pipe lines by which the city procures its water supply, and none of the waters of Goodrich Creek have ever been diverted to or used within the corporate

Sig. 2

limits of the city, and none have ever been diverted to or through the ditches and pipe lines by which the city has always received its water supply. None of these things have been done, or could have been done, for the reason that Goodrich Creek has never been connected with the going city water system, and the ditch and pipe line of that system has never been carried further north than Marble Creek, and about six and one-half miles of additional pipe line would be necessary to extend the pipe line by which the city is supplied from Marble Creek to Goodrich Creek.

"(11) The ditches by which the waters are diverted to the lessees for such purposes, and by which they have always been diverted, are the same ditches by which the predecessors in interest of the city used the waters of Goodrich Creek; but they are not a part of the ditches or water system by which the City of Baker now or ever did procure its water supply, and these waters which are now leased are not diverted through them, or by or through any ditch or pipe line by which the waters that are now used and have been used by the city are diverted.

"(12) About $90,000 is now being expended in improving and enlarging the present pipe line and water system of the city as far north from the junction of Elk Creek as Marble Creek; but no work is being done now in connecting Goodrich Creek with Marble Creek on the ditch and pipe line which supply the city with water.

"(13) The city has a present need of the waters of Goodrich Creek, and could and would use them if it had any means of diverting them to its going water system, or within its city limits for municipal purposes; but until such time as the necessary work of connecting Goodrich Creek with the ditch and pipe line is done, and an extension thereof is made, it expects and asserts the right to hold the waters of Goodrich Creek for its future needs or demands, and, pending such extension and connection to and with Goodrich Creek, to lease such waters and water rights to any one who will put them to a beneficial use, and to carry out the terms of the aforementioned lease. Under the terms and conditions of such lease, the lessees thereof, at all times from March 1st to October 1st, each and every year, have been putting such waters to a beneficial use.

"It is stipulated that, subject to any rights of the defendants of a prior date, the plaintiff made her filing on the waters of Goodrich Creek as alleged in plaintiff's cmplaint, and that such filing was approved by the State Engineer to the extent of 80 inches of the waters of Goodrich Creek, and that she has since applied said waters for irrigation of her lands, when permitted by defendants, and that plaintiff is the owner of the land described in the complaint."

With this practically agreed case before it, the circuit court overruled the demurrer to the answers and, the plaintiff declining to plead further, entered a decree according to the prayer of the answer, to the effect that the defendant City of Baker has a first and prior right to the water of Goodrich Creek, described in the pleadings in the suit, to the extent of 400 inches, miners' measurement, under a six-inch pressure, as such right is mentioned and described in defendant's first separate answer; that as against the defendant the plaintiff has no right to the use of the same, or any part thereof; that as between the parties to this suit said defendant's title in and to the use, enjoyment, and possession of such waters be forever quieted and confirmed; that the plaintiff be and is hereby enjoined from the use of the same, or interference with the use of such waters, or any part thereof, by the city or its agents or employees or lessees; and that the defendant have and recover its costs and disbursements.    The plaintiff has appealed from this decree.                                    Modified.

For appellant there was a brief over the names of *Messrs. McColloch & McColloch* and *Mr. William S. Levens,* with an oral argument by *Mr. Claude C. McColloch.*

For respondents there was a brief and oral arguments by *Mr. Gustav Anderson,* City Attorney, and *Mr. Charles S. Johns.*

MR. JUSTICE BURNETT delivered the opinion of the court.

The priority and superiority of the defendant city's right to use the water when it can use it being conceded by the plaintiff, the question is whether or not the leasing of the waters of Goodrich Creek to her neighbors is such a use by the city as will prevent the plaintiff from applying to her arid land, named in the complaint, the amount of water from that source permitted by the State Engineer. The plaintiff asks us to hold the defendant to the principle that the measure of the right of a water user is the actual beneficial use to which he puts the water, and that, although such person may be the prior appropriator, yet, subject to that right, a subsequent taker may employ the water in a beneficial way while the former is not using it. She maintains that her right in this respect is a valuable right, of which the city cannot deprive her to her injury by leasing to a stranger, and that by action of that kind the city has not established such a use of the water on its part as would supersede her privilege in that respect.

By section 1 of the act of the legislative assembly, filed in the office of the Secretary of State February 19, 1903, Baker City, with which the present City of Baker is identical, was incorporated, and it was declared that the city may "purchase, or acquire by the exercise of the right of eminent domain; may receive and hold property, both real and personal, within or without said city, for municipal purposes, and shall have the right of possession and control of all buildings, parks, property, and of all tracts of land belonging to said city, and other property which has been or may hereafter be dedicated, or in any manner whatsoever obtained for public purposes of said city; and may manage, lease, sell, or dispose of the same for the benefit of the city; may receive bequests, gifts, and donations of all kinds of property in fee simple, in trust, or otherwise, * * with power to manage, sell,

lease, or otherwise dispose of the same, in accordance with the terms of said gift, bequest or trust, or absolutely, in case such gift, bequest, or trust be unconditional." In subdivision 15 of section 174 of the same act, the council is declared to have power within the city "to provide the city with good and wholesome water, and for the erection of waterworks within or without the city limits, as may be necessary or convenient therefor, and to provide a fund for constructing and defraying the expenses of the same; to make all needful rules and regulations for the conduct and management of the same; to establish rates for the use and consumption of the water by the city, or the inhabitants thereof, including the people living along the line, or in the vicinity of the works outside of the city; to provide for the payment of water rates monthly in advance, and to shut off the water from any house, tenant, or place for which the water rate is not duly paid or when any rule or regulation is disregarded or disobeyed, and to make property liable for the water rent, rate, or charge, when the water is used thereon * * and to do any other act or to make any other regulation necessary and convenient for the management and conduct of such water system." Special Laws 1903, p. 595.

Bearing in mind that the object of the corporation is for governmental purposes, and not for gain or emolument, we note in the charter that the council is authorized to provide the city with good and wholesome water. This is the main purpose of the power conferred, and evidently contemplates that water shall be conducted to the city. Ancillary to that end is the provision allowing the erection of waterworks within or without the city limits, and the right to make regulations for the conduct and management of the same, and likewise to establish rates, charging not only the inhabitants of the city, but the people living along the line, or in the vicinity of the works

outside the city, for the consumption of water. It would be a strained construction to say that this section means that the city has power to provide strangers with good and wholesome water in the first instance. By mentioning the inhabitants of the city in the same category with people living along the line, or in the vicinity of the work outside of the city it is plain that all three of those classes are included together, and are to be treated alike; and hence it would follow that the water should be conducted within the city, so that the inhabitants thereof would be subject to rates for its use and consumption in like manner as people living along the line, or in the vicinity of the work outside of the city.

Allusion has been made to the act of the legislative assembly, filed in the office of the Secretary of State February 16, 1911, wherein it is provided:

"That any incorporated city or town, within the State of Oregon, owning, controlling, or operating a system of waterworks * * for supplying water for its inhabitants, and for general municipal purposes * * shall have the right, and are hereby authorized and empowered to sell, supply and dispose of water * * from such system to any person, persons, or corporation, within or without the limits of such incorporated city or town in which such water * * system is operated, and to make contracts in reference to the sale and disposal of water * * from such system, for use within or without the corporate limits." Laws 1911, p. 121.

This act evidently contemplates an established system actually supplying water to the inhabitants of a city, and really amounts to a legislative construction of the powers given to the municipal defendant by its charter granted in 1903. Although powers are amply conferred upon the city in the way of contracting and purchasing property, both within and without the city, yet they are all adjuncts to the main municipal purpose of the charter conferring governmental powers upon the city. It was

not designed that the city should embark in gainful occu-
pations.   Its interests as a proprietor are ancillary and
subordinate to the main purpose of its existence, viz.,
local government.   Although it has power to purchase
and own property both real and personal and to con-
tract with reference thereto, it would not be contended
that the city would have a right under such provision
of the charter, to engage in the millinery or shoe busi-
ness, or anything of that nature not helpful or useful
in the matter of government.

1, 2.   Conceding its ownership of the miners' appropri-
ation, as stipulated, yet it is for municipal purposes that
it acquired such property.   When it undertakes to act
with reference to that property as a private owner, it
is subject at best to the same rules that affect a private
person in a like situation.   According to the modern
accepted doctrine, it is the use of water, and not the
water itself, in which one acquires property in general.
Apparent exceptions to this are found in the drinking
of water, and such other uses as actually change its
form and substance, so that its identity as water is
destroyed; but in the main it is the use only of water
which is the subject of property.   Even at common law,
under which the doctrine of riparian rights most strongly
prevailed, the owner diverting water for use in mills,
or for other like purposes, was compelled to let it pass
to his lower neighbor undiminished in quantity and
quality, except as it was naturally consumed by the
processes employed.   He only had the use of the water
even under that regime.   In modern times it is largely
like the air or the sunlight, of which one may own, so
far as ownership may be predicated of the same, only
so much as he actually consumes.

3.   Within the meaning of its charter, the city has not
yet obtained the use of the water of Goodrich Creek,
although it has a right to acquire such use.   Until it does

acquire it by conducting the stream to the city, thus providing the city and its inhabitants with wholesome water, it is not in position to use it within the scope of its corporate powers. Meanwhile the plaintiff, to. the extent of her subsequent appropriation, may use the water, ceasing when the city, in the exercise of its superior right, actually diverts Goodrich Creek into the corporate limits. This is on the principle that the city as a private owner, possessed of prior appropriations, is using the same as a private owner in leasing the same to strangers, and as such must be subject to the rules which govern private owners in like situations. Neither the city, nor, so far as appears in the record, its predecessors in title, had the right to engage in the business of supplying water for manufacturing or irrigation purposes, to be used by people to whom they would sell the same. Under the most favorable construction of private proprietary interest in the city, the municipality is holding the water as a private owner for its own purposes; and, while it does not use it for its private benefit, it must be subject to the use of any subsequent appropriator. In short, if the city would act with reference to the miners' appropriations as if it were a private owner, as distinguished from a municipality, it must take the title *cum onere* and be subject to the rights of the subsequent appropriator to use the water while it is not in the use of the city. If it would exercise its charter powers over the water as a municipality it should conduct the water into the city, so as to provide the inhabitants with the same. So far as the waters of Goodrich Creek are concerned, it has not done this; and until it does so it cannot claim its full right as a municipality. Under the record, including the stipulations, as it appears before us, nothing here said is to be construed as impairing the right or title of the city to the appropriation already mentioned, or to continue its

.work of conducting the waters in question into the city, so it can use them for municipal purposes with the charter incidents of such use. The decree of the circuit court should be modified so as to quiet the title of the city to the waters of Goodrich Creek to the extent of 400 inches, miners' measurement, under a six-inch pressure, subject to the right of the plaintiff to use the same to the extent of the permission granted her by the State Engineer until such time as the city shall conduct the water into its pipe line, and thence within the municipal boundaries for use by its citizens. *Mann* v. *Parker,* 48 Or. 321 (86 Pac. 598) ; *Caviness* v. *La Grande Irrigation Co.,* 60 Or. 410 (119 Pac. 731) ; *McCoy* v. *Huntley,* 60 Or. 372 (119 Pac. 481) ; *Cantrall* v. *Sterling Mining Co.,* 61 Or. 516 (122 Pac. 42).

The decree of the court below will be modified accordingly.          MODIEIED: REHEARING DENIED.