Argued May 4 and 5, modified October 20, 1914, further modified on rehearing February 16, 1915.

## In Re WILLOW CREEK.*

(144 Pac. 505; 146 Pac. 475.)

**Constitutional Law—Distribution of Governmental Powers—Encroachment on Judiciary.**

1. Laws of 1909, page 319, creating a board of control with power to determine water rights, subject to review by the courts, on the request of persons interested, providing for ample notice to all claimants, does not confer judicial power on the board in violation of Article III, Section 1, of the Constitution, providing for division of the powers of government into three separate departments, and forbidding any person charged with official duties in one department to exercise the functions of another, except as in the Constitution expressly provided, or Article VII, Section 1, as amended November 8, 1910 (see Laws 1911, p. 7), vesting the judicial power in one Supreme Court and such other courts as may be created by law.

*As to the correlative rights of upper and lower proprietors to use water for irrigation, see note in 41 L. R. A. 741.

The question of the transfer of right to use water for irrigation is discussed in a note in 65 L. R. A. 407.

For the abandonment or loss of rights of prior appropriators of water, see note in 30 L. R. A. 265.                REPORTER.

Constitutional Law—Determination of Constitutionality—Presump-.
    tions.

2. Presumptions are in favor of the validity of Laws of 1909, page
319, providing for the regulation and determination of water rights.

Statutes—Construction—Giving Effect to All Parts.

3. That construction should be given a statute which will tend
to give effect to all of its provisions.

Statutes—Subjects and Titles—Requisites of Title.

4. Under Article IV, Section 20, of the Constitution, requiring every
act to embrace but one subject, and matters properly connected there-
with, which subject shall be expressed in the title, it is not essential
that the title to an act shall specify with particularity all the different
provisions of the act, but it is sufficient if the general subject is
contained in the title, and it is a fair index to the legislation, and all
the provisions are germane to the subject.

    [As to sufficiency of title of statutes, see notes in 64 Am. St.
    Rep. 70; Ann. Cas. 1915A, 79.]

Statutes—Subjects and Titles—Expression of Subject in Title.

5. The title to Laws of 1909, page 319, "An act providing a system
for the regulation, control, distribution, use and right to the use of
water, and for the determination of existing rights thereto within the
State of Oregon; providing penalties for its violation and appropriat-
ing money for the maintenance thereof, and declaring an emergency,"
is sufficiently broad to embrace any provision which the legislature
had the power to enact relating to a system for the regulation, con-
trol, distribution, use and right to the use of water, and for a deter-
mination of rights thereto.

Constitutional Law—Waters and Watercourses—Due Process of Law—
    Determination of Water Rights.

6. Laws of 1909, page 319, providing a system for the regulation
and determination of water rights, and making ample provision for
notice of proceedings to claimants, is not a taking of property without
due process of law.

Waters and Watercourses—Water Rights—Nature.

7. The right to the use of water is a valuable property right, guar-
anteed to every citizen, and cannot be arbitrarily or unreasonably
interfered with by the legislative department.

    [As to property in water, see note in 7 Am. Dec. 531.]

Waters and Watercourses—Water Rights—Determination.

8. Water rights are subject to such reasonable regulations as are
essential to the general welfare, peace and good order of citizens of
the state to the end that the use of water by one shall not be injurious
to the equal enjoyment of others entitled to the equal privilege of
using water from the same source, nor injurious to the rights of the
public.

Waters and Watercourses—Water Rights—Determination.

9. The requirements of Laws of 1909, page 319, that water users
upon due notice shall take measures for the ascertainment, certifying
    74 Or.—38

and recording of their water rights are not arbitrary, unreasonable nor unduly burdensome.

#### Waters and Watercourses—Water Rights—Determination—Decree.

10. Laws of 1909, page 328, Section 33, declaring a decree of the court confirming a determination of the board of control to be conclusive as to claimants of water rights lawfully embraced in the determination, precludes making such decree or order of determination conclusive upon any except those upon whom service of notice has been made pursuant to the statute.

#### Waters and Watercourses—Water Rights—Determination—"Any Such Claimant."

11. In Laws of 1909, page 328, Sections 33, 34, declaring a decree confirming a determination of water rights by the board of control conclusive as to all claimants lawfully embraced in the determination, requiring all claimants to submit proof of their claims, and providing that any such claimant who fails to submit proof of his claim is barred from asserting any prior rights, the phrase "any such claimant" refers to claimants lawfully embraced in the determination, and includes only those who have been duly served with process.

#### Water and Watercourses—Determination of Water Rights—Notice of Proceedings.

12. Ample provision being made in Laws of 1909, page 319, providing for the regulation and determination of water rights, for notice to all interested parties, it is not necessary that notice be given of each step in the proceedings.

#### Waters and Watercourses—Water Rights—Determination—Notice of Proceedings.

13. Laws of 1909, page 319, providing for notice by the division superintendent of proceedings to determine water rights, requires the notice to be signed by him.

#### Waters and Watercourses—Water Rights—Determination—Publication of Notice.

14. Laws of 1909, page 322, Section 12, requiring publication of notice of examination of the stream and of taking testimony in proceedings to determine water rights in newspapers having general circulation in the counties in which the stream is located, is not defective in not requiring that the newspaper in which publication is made be printed in the county, the publication, not the place of printing, being the essential matter.

#### Words and Phrases—"Publish."

15. The word "publish" is defined as "to make public; to make known to people in general"; "to issue; to put into circulation."

#### Waters and Watercourses—Water Rights—Determination—Notice.

16. Under Laws of 1909, page 319, requiring notice of proceedings to determine water rights to be sent by registered mail to each claimant, such notice should be sent to the person's postoffice address as far as the same could be reasonably ascertained.

**Waters and Watercourses—Water Rights—Determination—Notice.**

17. It is within the province of the legislature, as by Laws of 1909, page 319, relating to the determination of water rights, to say that registered mail may be used as a means of conveying notice when publication is also required, especially where in case of dispute a notice of contest is required to be served and returned the same as a summons in an action.

**Waters and Watercourses—Water Rights—Determination.**

18. Where land is comparatively level or susceptible of irrigation in ordinary seasons by overflow, without any particular exertion by the appropriator, in a proceeding to determine water rights, the appropriator may be allowed a priority of the amount reasonably required for the irrigation by a proper system.

[As to effect on rights of owner of non-navigable body of water of his making it navigable by artificial means, see note in Ann. Cas. 1914A, 73.]

**Waters and Watercourses—Water Rights—Appropriation—Regulation.**

19. A state may change the common-law rule as to riparian rights as to every stream within its dominion and permit the appropriation of the flowing waters for such purposes as it deems wise, subject, on the absence of the consent of Congress, to the limitation that the state cannot destroy the right of the use to water for beneficial use for government property, and subject to superior power of the general government, to prevent interference with navigation.

**Waters and Watercourses—Water Rights—Statutory Provisions.**

20. The rights of a holder of land the title to which passed from the government prior to the Desert Land Act (Act March 3, 1877, c. 107, 19 Stat. 377 [U. S. Comp. Stats. 1913, §§ 4674–4680]), relating to the appropriation of water for desert land, are not affected by the act.

**Waters and Watercourses—Irrigation—Rights of Riparian Owner.**

21. A riparian owner's rights to water for irrigation is limited to the amount needed and used, so that the amount of land irrigated, the character of soil, and the amount of water needed per acre must be known.

**Waters and Watercourses—Water Rights—Appropriation.**

22. The doctrines of prior appropriation and riparian rights are not so antagonistic that they may not exist in the same locality, and a settler on a non-navigable stream may rely either upon his rights as riparian proprietor or claim as an appropriator, but cannot do both.

[As to what constitutes appropriation of water, see note in 60 Am. St. Rep. 799.]

**Waters and Watercourses—Natural Watercourses—Riparian Rights.**

23. Every riparian proprietor is entitled, as against other riparian proprietors, to a reasonable use of the water of a non-navigable stream, and if the natural wants of all have been supplied, he may make a reasonable use of surplus for irrigation when he can do so without infringing on the rights of other proprietors.

**Waters and Watercourses—Water Rights—Appropriation.**

24. Under Section 6595, L. O. L., providing that actual application of water to beneficial use shall be deemed to create in a riparian proprietor a vested right to the extent of the actual application to beneficial use, a claimant is not entitled to an allowance of water in excess of the amount actually applied for a beneficial purpose.

**Waters and Watercourses—Water Rights—Determination—Evidence.**

25. Any error in the failure of a water board, proceeding under Laws of 1909, page 319, for the determination of water rights, to require evidence to support the statements of claims submitted under Section 14 of the act, is cured by the subsequent taking of over 1,800 typewritten pages of testimony of the proceeding, in the absence of proper application by a party for further hearing.

**Waters and Watercourses—Irrigation—Amount of Water Required.**

26. In a proceeding to determine water rights, where the board of control found that three acre-feet of water is sufficient to irrigate one acre, and that a flow of one eightieth of a second-foot for four months · will supply such an amount, and the evidence shows that during a considerable period there is but very little water for irrigation purposes, an allowance of one fortieth of a second-foot per acre till the 1st day of May of each year will be made, and thereafter the amount limited to a continuous flow of not to exceed one eightieth of a second-foot per acre, not to exceed three acre-feet per acre during any season.

[As to doctrine of rotation in use of water for irrigation purposes, see note in Ann. Cas. 1914A, 322.]

**Waters and Watercourses—Irrigation—Duration of Irrigation Season.**

27. In a proceeding to determine water rights, it is proper to allow the irrigation season to commence prior to the growth of crops.

**Waters and Watercourses—Water Rights—Appropriation—Priority.**

28. Where an irrigation ditch was commenced late in the fall of 1872, constructed halfway down in 1873, and extended and· completed in 1877, the work having been done with reasonable diligence, taking into consideration the surrounding conditions at the time, the appropriator is entitled to a priority as of 1873.

**Waters and Watercourses—Water Rights—Appropriation—Notice.**

29. A notice of appropriation, specifying as the point of diversion the southwest quarter of the northwest quarter of a section, while the map shows that the only portion of the section crossed by the stream is southwest quarter of the southwest quarter and that the southwest quarter of the northwest quarter is nearly a half mile from the stream, indicates a clerical error, and in the absence of intervening rights is sufficient.

**Waters and Watercourses—Water Rights—Appropriation.**

30. Under Section 6595, subdivision 7, L. O. L., providing that where applications of water and the work of construction or improvement thereunder have been made in good faith, they shall not be avoided because of any irregularity of the notice, where appropriations and improvements were made in good faith the fact that the map filed showing the route of the ditch, as required by Section 6529,

did not show the precise line of the ditch does not destroy its suffi-
ciency.

### Waters and Watercourses—Water Rights—Determination—Decree.

31. In a proceeding to determine water rights, a decree, reciting
that after the irrigation season begins all of the natural flow of the
stream is demanded for irrigation, and providing that the entire flow
shall be used for irrigation purposes till the amount to which each
user is entitled has been supplied, and any surplus over the combined
needs for irrigation may be stored as surplus water, does not conflict
with the finding of the water board that where water is stored by any
claimant, it shall be taken to any season of the year for storage ac-
cording to the dates of relative priority, and is in conformity with
Section 6526, L. O. L., providing that an irrigation company con-
structing a reservoir shall have the right to store any water not
needed for immediate use by any person having a superior right
thereto.

### Waters and Watercourses—Water Rights—Authority to Transfer.

32. Under Section 6668, L. O. L., providing that all water used for
irrigation purposes shall remain appurtenant to the land on which it
is used, provided, that if it should become impracticable to beneficially
or economically use water on land to which it is appurtenant, the
right may be severed from the land and become appurtenant to other
land without losing priority, if the change can be made without detri-
ment to existing rights, on the approval of an application of the
owner to the board of control, an application of an irrigation company
for the privilege of transferring its rights to water stored for irriga-
tion to the extent of the amount allowed per acre should be allowed,
subject to its being shown to the water board at any time that the
storage in a material way interferes with any prior or vested right.

[As to covenant with reference to water power as covenant
running with land, see note in Ann. Cas. 1915B, 875.]

### Waters and Watercourses—Irrigation—Right to Cross Lands—Effect of Injunction.

33. An injunction restraining an irrigation company from crossing
the lands of another does not prevent the company from obtaining
a right of way in the regular manner.

### Waters and Watercourses—Water Rights—"Abandon."

34. To "abandon" a water right means to desert or forsake it, and
to constitute an abandonment, the intent to abandon and an actual
relinquishment of the property must concur.

### Waters and Watercourses—Water Rights—Forfeiture by Nonuser.

35. The right to the use of water cannot be deemed forfeited by
nonuser short of the period prescribed by statute.

### Waters and Watercourses—Water Rights—Abandonment.

36. Under Laws of 1909, page 341, Section 70, subdivision 3, pro-
viding that where any riparian appropriator at the time the act is
filed shall be engaged in good faith in the construction of works for
the application of the water to a beneficial use, the right to take and
use the water shall be deemed vested in him, provided, the works be
completed within a reasonable time and the board of control shall

determine the time within which the water must be devoted to a bene-
ficial use, and subdivision 5, providing that the right of any person,
association or corporation to take and use water shall not be impaired
by the act where appropriations have been previously initiated and the
appropriators in good faith commenced the construction of works and
prosecuted their work diligently and continuously to completion, where
an appropriator has commenced the construction of works and prose-
cuted them in good faith, a delay caused by litigation and efforts to
obtain a right of way for irrigation ditches and reservoirs, failure of
the state engineer to act upon an application for a permit to appro-
priate water, and construction of Section 66 of the act, providing that
it shall be a misdemeanor to use, store or divert water till after the
issuance of the permit, as forbidding procedure until the permit was
granted, is not ground for forfeiture of rights.

Waters and Watercourses—Irrigation—Time for Application of Water.

37.   Under Laws of 1909, page 341, Section 70, subdivision 6, pro-
viding that the board of control may, on application of an appro-
priator, where actual construction work was commenced prior to the
passage of the act, grant a reasonable time after the construction of
the works or canal or ditch for the application of the water to a bene-
ficial use, where the construction of irrigation works was commenced
before the passage of the act and $112,000 was invested therein, five
years will be allowed for the application of the water to a beneficial
use.

Waters and Watercourses—Water Rights—Determination—Award to
      Tenant.

38.   Where a water right is awarded to the owner of land, it is not
necessary that an award should be made to the lessee thereof.

Waters and Watercourses—Water Rights—Determination.

39.   In a proceeding to determine water rights, evidence *held* to
show that water had been applied to a beneficial use by claimant,
though according to wasteful method then in vogue.

Waters and Watercourses—Water Rights—Method of Use.

40.   While the crude and wasteful manner of irrigation formerly
in vogue must be replaced by modern, economical methods, the ancient
means used for applying water is not a reason for forfeiting the right
to a sufficient amount to irrigate the land in a proper manner.

Waters and Watercourses—Water Rights—Determination—Decree.

41.   Where a decree in a proceeding to determine water rights
awarded water for a tract to two different claimants, it should be
modified to exclude one of them.

Waters and Watercourses—Water Rights—Determination—Evidence.

42.   In a proceeding to determine water rights, evidence *held* to
show a claimant entitled to an award of water for 32 acres, instead
of 40 acres as allowed by the decree.

Waters and Watercourses—Water Rights—Priority.

43.   Where the owners of a tract made an irrigation ditch in 1873,
but did not apply water to a portion afterward sold to a claimant
until 1882, and it does not appear that they intended to use the water

upon such portion till about 1882, the purchaser was properly awarded a priority as of 1882 only.

[As to prescriptive title to water, see note in 93 Am. St. Rep. 711.]

### Waters and Watercourses—Water Rights—Priority.

44. Where the filing of a notice of water rights under which an association claims was permitted to lapse for failure to commence active construction or continue it with reasonable diligence, and the applications of the association were filed with the state engineer on July 27, 1909, but an appropriation by an irrigation company of April 7, 1908, is valid and covers the surplus waters of the stream during each season, the water board properly refused a permit to the association.

### Waters and Watercourses—Water Rights—Determination—Evidence.

45. In a proceeding to determine water rights, evidence *held* to sustain the decree changing the relative priority of individual claimants and an irrigation company.

[As to priority to use of water of irrigation company, see note in Ann. Cas. 1913D, 625.]

### Waters and Watercourses—Water Rights—Measurements.

46. The water of various users, the rights to which are adjudicated, should be measured at the headgate or intake of each water user's lateral or service ditch.

### Waters and Watercourses—Water Rights—Measurements.

47. The waters from a river deposited in a creek through a ditch and afterward used by a claimant should be measured where they usually emptied into the creek, the place of measurement to be changed only by the water-master on authority of the water board.

### Waters and Watercourses — Water Rights — Determination — Clerical Errors.

48. Clerical errors in the adjudication of water rights should be corrected by the water board·upon its original records so as to show the correction made, and by what authority, and the proceedings will be referred to the water board with authority to make such corrections within three months from entry of the final decree in the trial court.

### ON REHEARING.

### Waters and Watercourses—Water Rights—Appropriation—Priorities.

49. Where in 1873 an irrigation ditch was constructed to a creek, and in 1877 the ditch was taken out of the creek a quarter of a mile below where it emptied into, and constructed beyond, the appropriation not being at first made for any land farther down than the creek, the lands served by it to the creek are entitled to a date of relative priority as of 1873, and those served from the extension as of 1877.

### Waters and Watercourses—Right to Appropriate—Abandonment—Determination.

50. Under Section 6546, L. O. L., declaring abandonment of right to appropriate water to be one of fact to be tried and determined as such, it does not take place as a matter of law without a trial of the facts.

Waters and Watercourses—Notice of Appropriation—Subsequent Appropriators.

51. The record of notice of appropriation of water by an individual under Section 6625, L. O. L., is notice, in favor of a corporation to whom he has conveyed his right by unrecorded deed, as against another subsequently filing such a notice.

Waters and Watercourses—Appropriation—"Abandonment."

52. "Abandonment" of a water appropriation is a voluntary relinquishment of a known right, to constitute which there must be a concurrence of acts and intent.

Waters and Watercourses — Applications to Appropriate — State Engineer.

53. The authority given by the water code to the state engineer to take into consideration the public welfare in passing on applications to appropriate water should not be carried to the extent of effacing vested rights.

[As to riparian proprietor's right to use water for irrigation purposes, see note in 20 Am. St. Rep. 225.]

Waters and Watercourses—Extent and Priority—Time of Determination.

54. The extent of appropriation by an irrigation company, the amount of water applied to a beneficial use, or its date of priority, depending on diligence in prosecution and completion of its works, cannot be determined till such completion.

From Malheur: DALTON BIGGS, Judge.

In Banc. Statement by MR. JUSTICE BEAN.

This is a proceeding under the act of 1909 (Laws 1909, p. 319), known as the "Water Code," which was begun on May 5, 1909, by filing with the board of control, water division No. 2, a petition signed by C. T. Locey and J. P. Smith, requesting a determination of the relative rights of the various claimants to the waters of Willow Creek, a stream in Malheur County, Oregon. The Circuit Court modified and confirmed the order of determination made by the board of control, now known as the water board. The Eastern Oregon Land Company and the Lower Willow Creek Users' Association and others have appealed. Modified and affirmed.

For appellant Eastern Oregon Land Company, there was a brief over the names of *Messrs. Teal,*

*Minor & Winfree* and *Messrs. Huntington & Wilson,* with oral arguments by *Mr. Wirt Minor* and *Mr. Bela S. Huntington.*

For appellant Lower Willow Creek Water Users' Association, there was a brief over the name of *Messrs. Huntington & Rand,* with oral arguments by *Mr. John L. Rand* and *Mr. Bela S. Huntington.*

For appellant Willow River Land & Irrigation Company, Limited, there was a brief over the names of *Messrs. Wheeler & Hurley, Messrs. Richards & Haga* and *Mr. McKeen F. Morrow,* with an oral argument by *Mr. Oliver O. Haga.*

For appellant Malheur Irrigation Company, Limited, there was a brief over the name of *Messrs. McCulloch, Soliss & Duncan,* with an oral argument by *Mr. John W. McCulloch.*

For respondents D. F. Boggs et al., there was a brief over the names of *Mr. George W. Hayes* and *Mr. C. M. Crandall,* with an oral argument by *Mr. Hayes.*

For respondent T. J. Brosnan, there was a brief and an oral argument by *Mr. William E. Lees.*

For respondents W. W. Beam, administrator et al., there was a brief over the name of *Messrs. McCulloch, Soliss & Duncan,* with an oral argument by *Mr. John W. McCulloch.*

For respondents J. A. Hoskins et al., there was a brief and an oral argument by *Mr. John L. Rand.*

For respondents C. T. Locey et al., there was a brief with oral arguments by *Mr. R. W. Swagler* and *Mr. W. H. Brooke.*

For respondents Fannie Howard et al., there was a brief and an oral argument by *Mr. W. H. Brooke.*

*Mr. George E. Davis* submitted a brief for John Norwood et al., respondents.

*Mr. J. A. Hurley* filed a brief for respondent *T. Charles Prichard.*

For the State Water Board, there was a brief submitted by *Mr. James T. Chinnock.*

MR. JUSTICE BEAN delivered the opinion of the court.

### GENERAL PROVISIONS OF THE ACT.

The act is entitled:

"An act providing a system for the regulation, control, distribution, use and right to the use of water, and for the determination of existing rights thereto within the State of Oregon; providing penalties for its violation and appropriating money for the maintenance thereof, and declaring an emergency."

Section 1 declares:

"Subject to existing rights, all waters within the state may be appropriated for beneficial use, as herein provided, and not otherwise; but nothing herein contained shall be so construed as to take away or impair the vested right of any person, firm, corporation, or association, to any water."

The legislature of 1913 (Laws 1913, p. 273) amended this section by adding that the provisions of the act do not apply to Multnomah Creek, Multnomah County, nor to the waters of the Columbia River, beginning at a point known as Big Eddy at The Dalles, and extend-ing to a point 10 miles above the Celilo Falls. The act divides the state into two water divisions; provides for the election of a state engineer, and a superin-

tendent for each division; authorizes the creation of the necessary number of water districts and the appointment of a water-master for each district. It states that the superintendent shall have general control over the water-masters of the several districts within his division, execute laws relative to the distribution of water, perform such other functions as shall be assigned to him, and have authority to make such reasonable regulations to secure the equal and fair distribution of water in accordance with the determined rights as may be needed in his division, not inconsistent with the laws of the state. His actions are subject to appeal to the board of control, which is composed of the state engineer and two division super-. intendents, who, under such regulations as may be prescribed by law, are given supervision over the application, distribution and division of the waters of the state, and the several officers concerned therewith. The decisions of the board are subject to revision and confirmation by the courts. Whenever a petition signed by one or more users of water on a stream is filed with the board of control, requesting the determination of the relative rights of the various claimants to the waters of such stream, it is made the duty of the board, if upon investigation it finds the facts and conditions such as to justify, to make a determination of such rights and to fix a time for the beginning of the taking of testimony and the making of such examinations as will enable it to determine the rights of the various claimants. In case suit is brought in any of the Circuit Courts of the state for the adjudication of the right to the use of the water, it may, in the discretion of the court, be transferred to the board for consideration, as provided by the act. In case the board concludes to proceed with the determination of

the rights of various claimants to water on any stream, it is required to give notice by publication of the date when the state engineer will begin investigating the flow of the stream and the ditches diverting water therefrom, and the time and place where the division superintendent will begin the taking of testimony. Service of such notice is required to be made by registered mail on each person, firm or corporation claiming a right to use any of the water of the stream, or owning or *being in possession of lands bordering on or having access thereto,* in so far as they can reasonably be ascertained, which notice must be mailed at least 30 days prior to the date of the making of the investigation and the taking of testimony. With each notice sent by registered mail, a blank form is required, on which the claimant or owner is required to state in writing the particulars necessary for the determination of his rights to the water to which he lays claim, including his name and address, the nature of the right or use on which the claim is based, the time of its initiation or the commencement of such use. If distributing works are required, the date of the beginning and completion of the construction and enlargements must be stated, the dimensions of the ditch, the date when water was first used for irrigation or for beneficial purposes, and, if used for irrigation, the amount of land reclaimed first and subsequent years with the dates of reclamation, the amount and general location of the land such ditch is intended to irrigate, the character of the soil, the kinds of crops cultivated, and such other facts as will show compliance with the laws in acquiring the right. This statement is required to be verified. Any claimant served with notice who fails to appear and submit proof of this claim as required shall be barred from subsequently assert-

ing any rights theretofore acquired. At the time fixed in the notice, the state engineer or his assistant is to make an examination of the stream and the works diverting water therefrom, measure the discharge of the stream, the carrying capacity of the various ditches and canals, an approximate measurement of the land irrigated or susceptible of irrigation from the various ditches and canals, and such other data and information as may be essential to the proper understanding of the relative rights of the parties interested. These observations and measurements are to be reduced to writing and made a matter of record in the office of the state engineer. It shall be his duty to make or cause to be made a map or plat showing with substantial accuracy the course of the stream, the location of each ditch or canal diverting water therefrom, and the legal subdivisions of lands which have been irrigated, or which are susceptible of irrigation from the ditches and canals already constructed. At the date named in the notice, the division superintendent is required to begin taking testimony and continue the same until completion. He shall give notice by registered mail to the various claimants that at a time and place named all the evidence will be opened for inspection for a specified length of time by the various claimants and owners.

Any claimant desiring to contest any of the rights of any person, firm, corporation or association which has submitted its evidence may, within five days after the expiration of the time fixed in the notice for the public inspection of the evidence, notify the superintendent in writing of the grounds of his proposed contest, and the superintendent is thereupon required to fix a time for the hearing of such contest before him, and to notify the interested parties, which notice and

the return thereof shall be made in the same manner as summonses are served in civil actions in the Circuit Courts. He may adjourn the hearing from time to time, and is authorized to issue subpoenas to compel witnesses to attend and testify in such matters, the evidence to be confined to the subjects enumerated in the notice of contest. After the evidence has all been taken the superintendent is required to transmit the same to the office of the board of control. As soon as practicable after the necessary data have been compiled by the state engineer and the evidence filed, it is made the duty of the board to cause to be entered of record in its office findings of fact and an order determining and establishing the several rights to the waters of the stream. The original evidence and certified copies of the observations, measurements and maps, of record in the state engineer's office, together with a copy of the determination and findings certified to by the secretary of the board, shall be filed with the clerk of the Circuit Court wherein the determination is to be heard, and a certified copy of such order of determination and findings shall be filed with the county clerk in every county on which the stream or any portion of a tributary is situated. The board shall thereupon procure an order from the court fixing a time at which the matter shall be heard. A certified copy of the order shall be forwarded to the secretary of the board, and he shall immediately send a notice of such hearing by registered mail to each claimant or owner who has appeared in the proceeding. Proof of the service of such notice shall be made and filed with the Circuit Court by such secretary. The determination of the board shall be in full force and effect, unless stayed by the giving of a bond as provided in the act. Section 26 provides that after

filing the evidence and order in the Circuit Court the proceeding shall be as nearly as may be like that in a suit in equity, except that it may be heard and decided and a decree entered in vacation. At any time prior to the hearing provided for by Section 6648, L. O. L., as amended in 1913, any person may file exceptions to the findings and order of the board, but if none are filed, the court is to enter a decree affirming the determination of the board. If exceptions are filed, the court at a fixed time shall hear all parties, and the board of control may appear on behalf of the State of Oregon, either by a member of such board or by the Attorney General. A copy of the exceptions shall be served upon each claimant who is an adverse party.

All parties are entitled to be heard by counsel on the consideration of the exceptions to the findings. The court may, if necessary, remand the matter for further evidence or consideration by the board. Immediately upon the entering of a decree by the Circuit Court, the clerk is required to transmit a copy thereof to the board of control, and it is the duty of the state engineer to forthwith issue the necessary instructions to the water superintendent and master for its enforcement.

Within six months of the date of the decree, or, if appealed from, within six months from the decision of the Supreme Court, the board of control, or any party interested, may apply to the Circuit Court for a rehearing. The determination of the board of control as confirmed or modified by the court is made conclusive as to all prior rights and the rights of all existing claimants upon the stream or body of water, lawfully embraced in such determination. It is made the duty of the secretary of the board to issue to each person, corporation or association represented in such

determination a certificate, signed by the president of
the board and attested under seal by the secretary,
setting forth his or its rights as so determined, and
such certificate is entitled to record in the office of the
county clerk of the proper county.

### Eastern Oregon Land Company, Appellant.

This company is a California corporation, and the
owner of a large amount of land in the watershed of
Willow Creek, a description of which is set forth in
this appellant's claim. The main channel of Willow
Creek passes through about 7,000 acres of these lands,
particularly described in the record, all of which the
Eastern Oregon Land Company alleges to be riparian
to the stream.

Willow Creek is a perennial stream with well-de-
fined bed and banks, wholly within Malheur County.
It has its source in the spur of the Blue Mountains,
flows in a southeasterly direction, and empties its
waters into the Malheur River at a point near Vale,
Oregon. Its entire flow is almost exclusively from
melting snow, and its quantity and duration are de-
pendent upon the extent of the snowfall, the time, and
the degree of temperature prevailing while the snows
are melting. The drainage district of the stream is
perceptibly divided into two valleys, which for con-
venience are called "Upper Willow Creek" and
"Lower Willow Creek." For 30 years or more the
stream has usually gone dry in Lower Willow Creek
by the 15th of June, varying from year to year. Parts
of Willow Creek go dry by the middle of July of each
year, but at certain places there is a small flow dur-
ing the greater part of the year by reason of springs
and the rising of water in the bed of the creek. A
canyon with precipitous sides about eight or nine

miles in length separates the two valleys of Willow Creek.

The Eastern Oregon Land Company claims an appropriation by means of a ditch constructed in the year 1882 by one Albert Wilson for the irrigation of about 80 acres in section 27, township 15 south, range 39 east, W. M.; an appropriation by virtue of a ditch constructed in 1887, known as the "Company Ditch," from Phipps Creek, a tributary of Willow Creek, for the irrigation of 47 acres in section 31; an appropriation through the company ditch in 1883 for 9½ acres in section 33; and also an appropriation by dams and ditches constructed by one T. J. Brosnan in 1887 for 80 acres in Section 23. These tracts of land, it is claimed, are separate and distinct from the other land of the company. This company also claims the right to have irrigated by natural overflow certain tracts of land particularly described in the record, aggregating 370 acres.

The Eastern Oregon Land Company derived its title to all the lands within the watershed of Willow Creek, with the exception of sections 16 and 36 acquired from the state, through The Dalles Military Road Company, under the act of Congress approved February 25, 1867, and the act of the legislative assembly of the State of Oregon approved October 20, 1868. The original granting act of Congress was a grant *in praesenti,* the title to such land having passed out of the government by the granting act itself. The title to said lands passed from the State of Oregon to The Dalles Military Road Company, then to Edward Martin, and from his heirs to the Eastern Oregon Land Company, which purchased the lands in 1884.

1. The appellants, the Eastern Oregon Land Com-

74 Or.—39

pany and the Lower Willow Creek Water Users' Association, joining in their brief, contend: (1) That the act of 1909, known as the "Water Code," is in violation of Section 1, Article VII, of the state Constitution; (2) that it undertakes to vest judicial power in a tribunal and officers not recognized by the Constitution. It is evident that in the enactment of the Water Code, the state being interested in providing a system for the regulation of the use of the water and for the determination of existing rights thereby exercised the police power of the state in order to provide a complete system of state control, in the regulation of the diversion and use of the water, and a means for having a record made of the rights to the same, for much the same purpose as records of title to real estate are provided: *Cookinham* v. *Lewis,* 58 Or. 484, 498 (114 Pac. 88, 115 Pac. 342); *Wattles* v. *Baker County,* 59 Or. 255, 261 (117 Pac. 417); *In re Silvies River* (D. C.), 199 Fed. 495; *Montezuma Canal Co.* v. *Smithville Canal Co.,* 218 U. S. 317 (54 L. Ed. 1074, 31 Sup. Ct. Rep. 67); *Farm Investment Co.* v. *Carpenter,* 9 Wyo. 110 (61 Pac. 258, 87 Am. St. Rep. 918, 50 L. R. A. 747); *Farmers' Independent Ditch Co.* v. *Agricultural Ditch Co.,* 22 Colo. 513 (45 Pac. 444, 55 Am. St. Rep. 149); *Hoge* v. *Eaton* (C. C.), 135 Fed. 411. The statute prescribing the duties to be performed by the water board and its members in their respective official capacities in a determination of water rights does not confer judicial powers or duties upon the board or such officers in any sense as indicated by the Constitution. Their duties are executive or administrative in their nature. In proceedings under the statute the board is not authorized to make determinations which are final in character. Their findings and orders are *prima facie* final and binding

until changed in some proper proceeding.    The findings of the board are advisory rather than authoritative.    It is only when the courts of the state have obtained jurisdiction of the subject matter and of the persons interested and rendered a decree in the matter determining such rights that, strictly speaking, an adjudication or final determination is made.    It might be said that the duties of the water board are *quasi* judicial in their character.    Such duties may be devolved by law on boards whose principal duties are administrative.    As said in *Reetz* v. *Michigan*, 188 U. S. 505, 507 (47 L. Ed. 563, 23 Sup. Ct. Rep. 390, 391):

"Indeed, it not infrequently happens that a full discharge of their duties compels boards, or officers of a purely ministerial character, to consider and determine questions of a legal nature.    Due process is not necessarily judicial process."

Many executive officers, even those commonly known as purely administrative officers, act judicially in the performance of their official duties, and in so doing do not exercise judicial powers as the words are commonly used and as they are used in the organic act in conferring judicial powers upon specified tribunals: *State* v. *Corvallis & E. R. R.*, 59 Or. 450 (117 Pac. 980); *Patterson* v. *N. T. Co.*, 170 Ill. App. 501, 511; *People* v. *Hasbrouck*, 11 Utah, 291 (39 Pac. 918).    In Washington the public utilities act was held not to confer judicial or legislative powers upon administrative officers: *State* v. *Superior Court*, 67 Wash. 37 (120 Pac. 861, Ann. Cas. 1913D, 78).    In Wisconsin the industrial commission was held to be an administrative body, the court saying:

"It is an administrative body or arm of the government, which in the course of its administration of a

law is empowered to ascertain some questions of fact and apply the existing law thereto, and in so doing acts *quasi* judicially; but it is not thereby vested with judicial power in the constitutional sense'': *Borgnis* v. *Falk Co.,* 147 Wis. 358 (133 N. W. 219, 37 L. R. A. (N. S.) 489).

See *Stettler* v. *O'Hara,* 69 Or. 519 (139 Pac. 743). The duties of the board of control are similar to those of a referee appointed by the court, The powers and duties of the three principal divisions of the state government, legislative, executive and judicial, are necessarily sometimes blended to a limited extent. The preservation of lines between them is the fundamental idea in the organic act, and the continuance of regulated liberty depends on maintaining these boundaries: Willoughby on the Constitution, Vol. 2, § 742; *Biggs* v. *McBride,* 17 Or. 640, 648 (21 Pac. 878, 5 L. R. A. 115). Delegation of powers to boards or commissions has generally been sustained by the courts throughout the country: *Oregon R. & N. Co.* v. *Campbell* (C. C.), 173 Fed. 957; *Portland Ry., L. & P. Co.* v. *Railroad Commission,* 56 Or. 468 (105 Pac. 709, 109 Pac. 273).

The separation of the powers, both state and national, has not been complete. The practical necessities of efficient government prevent a complete defined division. It has been necessary to vest in each department certain powers which primarily should not belong to it. Courts establish rules of practice to govern procedure therein, and thereby in a certain sense exercise legislative functions; they appoint officers, in reality executive acts. Courts have no hesitation in performing ministerial acts if such are incidental to the exercise of their proper judicial functions. Legislation of recent years creating commissions for

various purposes such as regulating rates of public utilities is a familiar instance of the overlapping of governmental functions. In many respects these acts provide for the performance of duties by administrative boards judicial in their nature or *quasi* judicial.

Unless the suit is first commenced in court and the cause referred to the board under Section 6635, L. O. L., the proceedings before the board are not initiated by the filing of a complaint or pleading setting up the rights claimed. A mere request is made by one or more water users upon a stream. The board is required to make an investigation to ascertain whether or not the conditions justify proceeding. In order to obtain injunctive relief or to exercise the right of eminent domain, resort must be had to the courts. In a proceeding before the board, provision is made for an impartial examination and measurement of the water in a stream, of the ditches and canals, and of the land susceptible of irrigation, and for the gathering of other essential data by the state engineer, including the preparation of maps, all to be made a matter of record in the office of the state engineer, as a foundation for such hearing and to facilitate a proper understanding of the rights of the parties interested. Under the old procedure such information was often omitted. When measurements were made by the various parties to a suit they were nearly always made by different methods and were conflicting. The other evidence in regard thereto, being mere estimates, rendered a determination extremely difficult for the court and of questionable accuracy and value when made. To accelerate the development of the state, to promote peace and good order, to minimize the danger of vexatious controversies wherein the shovel was often used as an instrument of warfare, and to provide a convenient

way for the adjustment and recording of the rights of the various claimants to the use of the water of a stream or other source of supply at a reasonable expense, the state enacted the law of 1909, thereby to a limited extent calling into requisition its police power. By proceeding in accordance with the statute, when the matter is presented to the court for judicial action, it is in an intelligible form. The water board and state may then be represented by counsel. Liberal provision is made for all interested parties to be notified and heard.

In the proceeding under consideration we are not to pass upon the right of any parties except those whom the record shows to have been duly served with process or to have appeared in the proceeding: *Leffingwell* v. *Lane County,* 64 Or. 144, 151 (129 Pac. 538). About 93 persons and corporations have submitted their claims for adjudication. Mr. Justice BEAN uses the following language in the case of *In re Silvies River* (D. C.), 199 Fed. 501:

"Now the preliminary proceedings before the state board of control, in taking testimony and making findings of fact concerning the rights of the various claimants to the waters of a given stream, are, in my judgment, not judicial, but rather administrative."

2, 3. Presumptions are in favor of the validity of the act. A fair construction will give nearly all of its provisions force and effect. That a construction which will tend to such an attainment should be given a statute is a well-settled principle of law.

Article III, Section 1, of the Constitution is as follows:

"The powers of the government shall be divided into three separate departments—the legislative, the executive, including the administrative, and the judicial;

and no person charged with official duties under one of these departments shall exercise any of the functions of another, except as in this Constitution expressly provided."

Article VII, Section 1, of the Constitution, as amended November 8, 1910 (Laws 1911, p. 7), provides in part that:

"The judicial power of the state shall be vested in one Supreme Court and in such other courts as may from time to time be created by law."

The statute in question does not contravene either of these sections of our organic law.

The law of 1909 has been recognized by this court as having force in the following cases: *Cookinham* v. *Lewis,* 58 Or. 484 (114 Pac. 88, 115 Pac. 342); *Wattles* v. *Baker County,* 59 Or. 255 (117 Pac. 417); *Pacific Livestock Co.* v. *Davis,* 60 Or. 258 (119 Pac. 147); *Pringle Falls Electric P. Co.* v. *Patterson,* 65 Or. 474 (128 Pac. 820, 132 Pac. 527); *Claypool* v. *O'Neill,* 65 Or. 511 (133 Pac. 349); *In re Schollmeyer,* 69 Or. 210 (138 Pac. 211). The statute has also been given effect in several cases by the United States Court for the District of Oregon.

4. It is next urged by these two appellants that the act is in violation of Article IV, Section 20, requiring that:

"Every act shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title."

It is not essential that the legislative title to an act shall specify with particularity all the different provisions of the act. It is sufficient if the general subject of the act is contained in the title and is a fair index to the legislation proposed, and if all the provisions of the act are germane to such subject and do

not relate to matters wholly foreign thereto: *Clemmensen* v. *Peterson,* 35 Or. 47 (56 Pac. 1015); *Spaulding Logging Co.* v. *Independence Imp. Co.,* 42 Or. 394 (71 Pac. 132).

5. The title to the act set out above is sufficiently broad to embrace within the terms of the act any provision which the legislature had the power to enact relating to a system for the regulation, control, distribution, use and right to the use of water, and for a determination of rights thereto: *State* v. *Shaw,* 22 Or. 288 (29 Pac. 1028); *State* v. *Portland Gen. Elec. Co.,* 52 Or. 502 (95 Pac. 722, 98 Pac. 160); *Escott* v. *Crescent Coal & Nav. Co.,* 56 Or. 190 (106 Pac. 452). As we view it, the signification and not the validity of the main provisions of the act is the chief question.

6, 7. It is claimed, also, that the act is in contravention of the constitutional provision that no person shall be deprived of his property without due process of law. This indispensable constitutional safeguard should be carefully applied and never infringed upon. If any clause of the act in question is not in consonance therewith, its effect should be eliminated, or else it should, if consistent, be given an application in conformity with the letter and spirit of the organic law. The first section of the act declares that nothing therein contained shall be so construed as to take away or impair the vested right of anyone to any water; and Section 70, subdivision 1, is to the same effect. Any appropriation of water under the provisions of the act is thereby made subject to such condition. In the absence of such legislative announcement the lawmakers have no power to destroy such a right. The main purpose of the law is to protect water rights and to promote the utilization of the same. The right to the use of water is a valuable property right

guaranteed to every citizen. It cannot be arbitrarily nor unreasonably interfered with by the legislative department of the state.

8. Water rights, like all other rights, are subject to such reasonable regulations as are essential to the general welfare, peace and good order of the citizens of the state, to the end that the use of water by one, however absolute and unqualified his right thereto, shall not be injurious to the equal enjoyment of others entitled to the equal privilege of using water from the same source, nor injurious to the rights of the public: *State* v. *Muller,* 48 Or. 252 (85 Pac. 855, 120 Am. St. Rep. 88, 11 Ann. Cas. 88) ; *Muller* v. *Oregon,* 208 U. S. 412 (56 L. Ed. 834, 28 Sup. Ct. Rep. 324) ; *Commonwealth* v. *Alger,* 7 Cush. (Mass.) 53, 84.

''It is within the undoubted power of state legislatures to pass recording acts by which the elder grantee shall be postponed to a younger, if the prior deed is not recorded within the limited time'': *Jackson ex dem. Hart* v. *Lamphire,* 3 Pet. 280, 7 L. Ed. 679; *Farm Invest. Co.* v. *Carpenter,* 9 Wyo. 110 (61 Pac. 258, 87 Am. St. Rep. 918, 50 L. R. A. 747) ; *White* v. *Farmers' High Line Canal & Reservoir Co.,* 22 Colo. 191 (43 Pac. 1028, 31 L. R. A. 828).

9. The requirements of the statute that water users upon due notice shall take measures for the ascertainment, certifying and recording of their water rights are not arbitrary, unreasonable nor unduly burdensome. The main provisions of the law should be enforced. They are salutary and in the inter-st of an orderly regulation of the use of water to be made by skilled officers who have peculiar knowledge in that line.

10–12. The objections to the process are evidently directed to that part of Section 34 referring to persons

who are interested in the water of a stream upon which
an investigation and determination are made, upon
whom no service of notice is had. Section 33 in effect
declares a decree of the court confirming a determina-
tion of the board to be conclusive as to claimants *law-
fully embraced in the determination.* This declara-
tion precludes making such decree or order of deter-
mination binding and conclusive upon any except those
upon whom service of notice has been made pursuant
to the statute. Section 34 states that it is the duty
of all claimants when such proceedings are instituted
to submit proof of their claims. The latter part of
this section, particularly referring to interested par-
ties who have not been served with notice, provides
that such parties who had no knowledge or notice of
the pendency of the proceedings may intervene upon
equitable terms at any time within one year, or be pre-
cluded from having their rights adjudicated in such
proceeding; that is, the words "any such claimant"
who fails to submit proof of his claim and is barred
and estopped from subsequently asserting any prior
rights refer to "existing claimants upon the stream
or other body of water lawfully embraced in the de-
termination," including only those who have been duly
served with process. Such construction renders each
clause of these two sections efficacious. The statute
requires notice of the time of the investigation of a
stream by the state engineer, and of the time and
place of taking proof of claims to water, service to be
made by publication and registered mail 30 days prior
to the examination of the stream or the taking of the
testimony, and notice by registered mail of the time
and place of the inspection of the evidence, and the
county in which the determination will be heard by the
Circuit Court. The statute also requires a notice of

contest, stating and verifying the grounds therefor, to be given by anyone interested desiring to contest any of the rights of those who have submitted their evidence to the superintendent. That officer is directed to notify the contestant and contestee of the time and place of the hearing. This notice must be served and a return thereof made in the same manner as a summons is served and returned in the Circuit Courts; therefore a copy of the notice of contest must be served upon the contestee with the notice of the hearing, thus informing the party of the basis of the contest. Under the amendment of 1913, notice of the time and place of the hearing of the determination by the Circuit Court must be given by the secretary of the board by registered mail to all claimants who have appeared. The law provides that the proceedings in the courts shall be as nearly as may be like those in a suit in equity. Ample provision is made in the law for a notice to all interested parties, and that they may be duly heard in court. It is not necessary that notice be given of each step in the proceedings.

13. It is objected that the law does not require the superintendent to sign the notice, but we do not so construe the statute. An unsigned notice is not a notice within the purview of the act.

14. Section 12 requires that the notice of examination of the stream and of taking testimony shall be published—

"in two issues of one or more newspapers having general circulation in the counties in which such stream is situated, the last publication of said notice to be at least thirty days prior to the beginning of taking testimony by said division superintendent, or for the measurement of the stream by the state engineer, or his assistant. The superintendent taking such testimony shall have the power to adjourn the taking of

testimony from time to time and from place to place, to suit the convenience of those interested."

Exception is taken for the reason that the newspaper in which the publication is made is not required to be *printed* in the county. Section 57, L. O. L., providing for the publication of a summons does not make such requirement. The substance of this last-named section has been in force ever since the code was adopted. It is the publication of the notice that is essential. The place where the printing is done is not a matter of importance.

15. The word "publish" is defined as "to make public; to make known to people in general * * ": Webster's Dictionary. "To issue * * to put into circulation": 7 Words and Phrases, 5847.

16. It would seem that the notice by registered mail should be sent to the person's postoffice address, as far as the same could be reasonably ascertained, in order to be a compliance with the statute in this respect. Our established practice in the courts aids in construing this law. The manner of service of process is regulated by statute.

17. It is within the province of the legislature to say that registered mail may be used as a means of conveying a notice, when publication is also required, and especially where in case of dispute a notice of contest is required to be served and returned the same as a summons in an action in the courts: *Farm Investment Co.* v. *Carpenter,* 9 Wyo. 110 (61 Pac. 258, 87 Am. St. Rep. 918, 50 L. R. A. 747); *Tyler* v. *Judges, etc.,* 175 Mass. 71 (55 N. E. 812, 51 L. R. A. 433); *Town of Hinckley* v. *Kettle River Co.,* 70 Minn. 105 (72 N. W. 835). The act is not inimical to the organic law in respect to due process.

18. In addition to the amount allowed it, the Eastern Oregon Land Company claims the right to the water of Willow Creek for the purpose of overflowing and irrigating 292.02 acres. It is shown by the testimony of an engineer that this land is comparatively level and susceptible of irrigation in ordinary seasons by means of overflow, without any particular exertion on the part of the company. It was carefully surveyed and is described in the testimony. The overflow of these lands is analogous to a crude manner of irrigation much the same as the method adopted by other irrigators on this stream system at an early day, when they cut ditches and allowed the water to flow into the sloughs and low places and subirrigate their lands. It is unimportant how difficult or with what ease water can be appropriated for irrigation. It is tantamount to a beneficial use and is a valuable right which should not be ignored. Subject to the general provision hereinafter made for an increase during the flood season, and subject to the rights since acquired by adverse user and the like, and antagonistic thereto, the company should equitably be allowed the usual amount, 3.65 second-feet (date of relative priority 1867), from the waters of Willow Creek for the irrigation of the following lands: 45.60 acres in the north quarter of the north quarter of section 23, 88.68 acres in section 5, 36 acres in section 13, 41 acres in section 25, all in township 16 south, range 43 east, W. M., and 80.74 acres in section 15, township 17 south, range 44 east, W. M. This is a reasonable use of the water for the irrigation of such lands. We deem the conditions as to these lands, as shown by the evidence, to be exceptional, and believe the right of all will in this manner be conserved. This may entail the expense of installing measuring devices and slight incon-

venience of trivial consequence, to which question we have already alluded. The methods relied upon by the Eastern Oregon Land Company in the use of water, as well as similar use made by other irrigators in former years, is wasteful. It is often permitted as a privilege and not as a right, while it can be exercised without injury to anyone: *Hough* v. *Porter,* 51 Or. 318 (95 Pac. 732, 98 Pac. 1083, 102 Pac. 728). The laws of the state and public policy alike demand that all waters available for irrigation purposes must be conserved and used in a manner that will permit of the highest development of the agricultural and other resources of the state. The best methods for the application of water to the land should be used. No person should be allowed more water than is necessary when applied by a proper system; this, in order that a larger area may be made productive by the extended application of such water. All the rights adjudicated in these proceedings are subject to this rule.

19. In support of its claim the company contends that the law of riparian rights recognized in this state at the time the appellants' land passed out of the government should govern their rights, and cannot be affected by appropriations made subsequent to that time except as such appropriation rights have become vested by consent, purchase or adverse user.

The common-law rule as to a riparian owner is stated by Chancellor Kent (3 Kent's Commentaries, § 439) as follows:

"Every proprietor of lands on the banks of a river has naturally an equal right to the use of the water which flows in the stream adjacent to his lands, as it was wont to run (*currere solebat*) without diminution or alteration. No proprietor has a right to use the

water, to the prejudice of other proprietors, above or below him, unless he has a prior right to divert it, or a title to some exclusive enjoyment. He has no property in the water itself, but a simple usufruct, while it passes along, '*Aqua currit et debet currere ut currere solebat*' is the language of the law. Though he may use the water while it runs over his land as an incident to the land, he cannot unreasonably detain it, or give it another direction, and he must return it to its ordinary channel when it leaves his estate.''

This rule prevails in the State of Oregon only to a limited extent. The old rule of ''continuous flow'' has been changed by custom and crystallized into express law by statute. It is stated in effect in *United States* v. *Rio Grande Irr. Co.,* 174 U. S. 690, 702 (43 L. Ed. 1136, 19 Sup. Ct. Rep. 770), that this rule obtains in those states in the United States which have simply adopted the common law It is also true undoubtedly that a state may change its common-law rule as to every stream within its dominion and permit the appropriation of the flowing waters for such purposes as it deems wise. In the absence of the consent of Congress this authority is limited: (1) So that the state cannot destroy the right of the United States to water necessary for beneficial uses for government property; and (2) it is limited by the superior power of the general government to prevent interference with the navigation of navigable streams.

In 1891 the legislature of this state passed an act (Laws 1891, p. 52) declaring that the use of the waters of the lakes and running streams of the State of Oregon for general rental, sale or distribution, for purposes of irrigation, for household and domestic consumption and watering livestock upon dry land of the state is a public use and the right to collect rents or compensation for such use of the water is a franchise, and

granting to corporations organized for such purposes the right to appropriate water and condemn the rights of riparian proprietors upon the lake or stream from which such appropriation is made. This right to condemn has been exercised: *Umatilla Irr. Co.* v. *Barnhart,* 22 Or. 389 (30 Pac. 37).

By act of Congress, July 26, 1866, Chapter 262, 14 Stat. 253, Section 9, (§ 2339, R. S. U. S., 7 Fed. Stats. Ann. 1090, 1093, U. S. Comp. Stats. 1913, § 4647), whenever rights to the use of water for mining, agricultural, manufacturing or other purposes have vested and accrued by priority of possession and are acknowledged by local customs, laws, and decisions of courts, the same are recognized and protected. This act established no new right. The practical construction of this statute has been that as long as the land belonged to the United States the water flowing over the same was subject to appropriation for any of the purposes named when such appropriation was recognized by the local customs, laws or decisions of the courts; but if the water was not so appropriated, it was not subject to appropriation after the land over which it flowed became private property: *Davis* v. *Chamberlain,* 51 Or. 304, 315 (98 Pac. 154); *Broder* v. *Water Co.,* 101 U. S. 274 (25 L. Ed. 790); *Rio Grande Western R. R. Co.* v. *Telluride P. & T. Co.,* 16 Utah, 125, 137 (51 Pac. 146); *Benton* v. *Johncox,* 17 Wash. 277, 287 (49 Pac. 495, 61 Am. St. Rep. 912, 39 L. R. A. 107); *Sturr* v. *Beck,* 133 U. S. 541 (33 L. Ed. 761, 10 Sup. Ct. Rep. 350).

20. By act of March 3, 1877, Chapter 107, 19 Stat. 377, known as the Desert Land Act, 6 Fed. Stat. Ann. 392 (U. S. Comp. Stats. 1913, §§ 4674–4680), it was provided in part as follows:

"That the right to the use of water by the person so conducting the same, on or to any tract of desert land of 640 acres, shall depend upon *bona fide* prior appropriation; and such right shall not exceed the amount of water actually appropriated, and necessarily used for the purpose of irrigation and reclamation; and all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights."

Title to the land of the Eastern Oregon Land Company passed from the government prior to this act; therefore its rights are not affected thereby: *Hough v. Porter,* 51 Or. 318 (95 Pac. 732, 98 Pac. 1083, 102 Pac. 728).

21. It is said by Mr. Judge BEAN, in the case of *Eastern Oregon L. Co.* v. *Willow River Land & Irr. Co.,* decided by the Circuit Court of the United States for the District of Oregon, November 10, 1910, 187 Fed. 466:

"The general doctrine of riparian rights is too firmly established in this state to be shaken now by judicial decision. It is useless to cite authorities. The riparian proprietor is entitled to the ordinary * * flow of a stream as long as it is of any beneficial use to him, and this may, under some circumstances, include flood or overflow waters * * to be anticipated during ordinary seasons."

*Pacific Livestock Co.* v. *Davis,* 60 Or. 258 (119 Pac. 147), was a case in which the conditions and the location of the land were very much like those in the case at bar. A riparian proprietor cannot lay claim to the undiminished flow of a stream without actual use

74 Or.—40

simply because it adds beauty to the outlook: 4 Kinney, Irr., § 1975. A riparian owner's right to water for irrigation is limited to the amount of water needed and used, so that, to determine that fact, the amount of land irrigated, the character of the soil, and the amount of water needed per acre must be known: *Hedges* v. *Riddle,* 63 Or. 257 (127 Pac. 548).

22. In *Jones* v. *Conn,* 39 Or. 30 (64 Pac. 855, 65 Pac. 1068, 87 Am. St. Rep. 634, 54 L. R. A. 630), it was held in a controversy between riparian proprietors upon a natural watercourse, that a riparian proprietor has a right to the use and enjoyment of the water that naturally flows past or through his land, subject to the right of other riparian owners to a reasonable use thereof for domestic, agricultural and manufacturing purposes, provided that the upper proprietor does not appropriate enough to substantially injure the common right which each proprietor has. The nature and extent of the right of a riparian proprietor to the water of a stream for irrigation cannot be measured by any definite or fixed rule, nor can the amount of water which he is entitled to use for that purpose ordinarily be definitely determined; it being necessarily a varying quantity, depending upon the use by other proprietors and whether its use by him will be an injury to them. The doctrine of prior appropriation and riparian rights is not so antagonistic that they may not exist in the same locality. A settler on a nonnavigable stream has the election either to rely upon his rights as riparian proprietor or to make an appropriation of the water and claim as an appropriator, but he cannot do both: *Williams* v. *Altnow,* 51 Or. 277, 300 (95 Pac. 200, 97 Pac. 539); *Crawford* v. *Hathaway,* 60 Neb. 754 (84 N. W. 271); *Crawford* v. *Hathaway,* 61 Neb. 317 (85 N. W. 303); *Crawford* v. *Hatha-*

*way,* 67 Neb. 325 (93 N. W. 781, 108 Am. St. Rep. 647, 60 L. R. A. 889).

23. Every riparian proprietor is entitled, as against other riparian proprietors, to a reasonable use of the water of a non-navigable stream flowing through his land, and after the natural wants of all have been supplied he may make a reasonable use of the surplus for irrigation purposes when he can do so without infringing upon the corresponding rights of the other proprietors: *Jones* v. *Conn,* 39 Or. 30 (64 Pac. 855, 65 Pac. 1068, 87 Am. St. Rep. 634, 54 L. R. A. 630). See, also, *Little Walla Walla Irr. Co.* v. *Finis Irr. Co.,* 62 Or. 348 (124 Pac. 666, 125 Pac. 270); *Sherred* v. *Baker,* 63 Or. 28 (125 Pac. 826). It was held in *Caviness* v. *La Grande,* 60 Or. 410, 421 (119 Pac. 731, 735), that:

"In the very nature of things, a court cannot fix in advance by its decree what quantity of water will be reasonable in the future for the use of a riparian proprietor claiming the duty of water in that character."

Our statute was copied largely from the statute of Wyoming, though the Constitution of that state differs from ours in that riparian rights have never been recognized.

24. In the arid and semi-arid lands of the west the early home-builders first settled upon the streams and other bodies of water. The rights of such people to a reasonable use and benefit of the water flowing over their lands which they have appropriated or used for a beneficial purpose should be carefully considered and not abrogated. Those obtaining title to land take the same subject to the laws then prevailing and defining the appurtenances thereto. When such rights have become vested, they cannot be taken away by legislative enactment nor judicial decree. Like all property they are subject to reasonable regulation. In this pro-

ceeding the Eastern Oregon Land Company should be awarded no additional use of water, not having shown that it has ever applied to a beneficial purpose any of the water of such stream in excess of the amounts above specified, or that it desired or intended to do so, and not having shown what part of its other land is susceptible of irrigation: Section 6595, subd. 2, L. O. L.

25. It is contended that the water board proceeded irregularly and exercised its functions erroneously in not requiring evidence in support of the statement of claims submitted under Section 14, and that this was sanctioned by the trial court. The board was not governed entirely by such statements. The maps, plats and records of the investigation made by the state engineer in the matter under consideration are *prima facie* evidence; therefore there was some evidence in regard to such claims before the board. It would seem that if any error in this respect was committed, it was cured by the subsequent taking of over 1,800 typewritten pages of testimony in the proceeding. Otherwise, if any party has not been fully heard, he should make proper application for such hearing.

26. The board of control in its order of determination fixed two limitations on the amount of water to which an appropriator should be entitled, namely, a continuous flow of not to exceed one eightieth of a second-foot for each acre of land or an amount equal thereto distributed under the rotation system. The Circuit Court eliminated the provision limiting each appropriator to one eightieth of a cubic foot per second, and left but one limitation of three acre-feet per acre during the irrigating season. We recognize the great difficulty in establishing the duty of water. Willow Creek is a perennial stream, and as soon as the

spring floods are over the creek is dry and there is not sufficient water to irrigate any large body of land without storage. The time of these floods varies according to the time of the spring thaws of each season. In order to irrigate the lands during the time such water is running, it is necessary to have a sufficient head of water to saturate each parcel quickly. The water board found that three acre-feet of water is sufficient with which to irrigate one acre of land during any irrigating season; that a flow of one eightieth of a second-foot for a period of four months will supply such an amount. It is shown by the evidence that during a considerable portion of such four months there is but very little water in the creek for irrigation purposes, and in order that a proper use may be made of the water during the so-called flood season, we deem it necessary to allow a larger amount to be used during such time. In order to properly regulate the use of the water of this stream it is necessary to place some restriction upon the amount to be used at any one time; therefore, for the lands to be irrigated as provided for in these proceedings, the amount of water is limited to a continuous flow not to exceed one fortieth of a second-foot for each acre of land during the irrigating season until the first day of May of each year, and thereafter during the remainder of the irrigating season the amount of water is limited to a continuous flow of not to exceed one eightieth of a second-foot for each acre of land, not to exceed three acre-feet per acre during any irrigating season. The provision made by the board of control for a rotation system is approved.

27. It is urged that the irrigation season should not commence until water is actually required for the growing crops, that is, that irrigation should not be

allowed except when crops are being grown upon the land. We cannot accede to this contention. While irrigation is for the purpose of growing and maturing crops, trees, grasses, etc., yet such use is the ultimate purpose of watering the land when the water can be obtained, even though it be prior to the growth of the crops, or what is usually called winter irrigation. It has long been the custom of the people residing upon the stream system to irrigate their lands preparatory to raising crops thereon during the season of high water, or the so-called flood season. So long as the water is used without unnecessary waste thereof, the people should not be deprived of this right.

28. In finding No. 22 there appears to be a clerical error in the description of a barrel siphon of the Willow River Land & Irrigation Company. It is described as carrying 50 second-feet of water from the canal to Reservoir No. 1. This is corrected to read 200 second-feet. The water board found that the Willow River Land & Irrigation Company was entitled to a priority as of 1873 to the water used in what is known as the "Company Ditch." The Circuit Court changed this date of priority to 1877. The record shows that the ditch was commenced late in the fall of 1872, was constructed about halfway down in 1873, and extended and completed in 1877. This appellant asks that the doctrine of relation be applied. In the adjudication of water rights this doctrine has frequently been applied by this court. In *Whited* v. *Cavin,* 55 Or. 98 (105 Pac. 396), this court said:

"Arrangements were made in 1883, whereby the plaintiffs joined in the enlargement and extension of the ditch begun by Whited in 1881, and the work of enlarging and extending it, to cover their lands, was diligently prosecuted until its completion, which was

accomplished within four years from the commencement thereof. This, we believe, in view of the difficulties encountered in its construction, and other circumstances disclosed by the record, was within a reasonable time. * * It is well settled in this state that, under such circumstances, plaintiffs' rights relate back to the commencement of their work in 1883. * * ''

See, also, *Nevada Ditch Co.* v. *Bennett,* 30 Or. 59 (45 Pac. 472, 60 Am. St. Rep. 777); 2 Kinney on Irr. & Water Rights (2 ed.), Section 744. It is not questioned but that the work was prosecuted with reasonable diligence, taking into consideration the surrounding conditions at that time. The priority for this ditch as fixed by the water board as of 1873 is approved.

### WILLOW RIVER LAND & IRRIGATION COMPANY.

This company is the owner of what is known as the "Willow River Project," consisting of reservoirs for storing and conserving the waters of Willow Creek and its tributaries and an extensive system of canals and distributing ditches, together with several thousand acres of land, representing an expenditure of approximately $2,000,000 in land and irrigation system. The system is substantially completed. It was constructed for the purpose of extending the use of the waters appropriated to the reclamation of large tracts of arid lands not heretofore irrigated. The company is now enlarging and extending a large reservoir generally known as the "Upper Reservoir," or "Reservoir No. 3." The dam and outlet is constructed across the main channel of Willow Creek, and from the dam the reservoir extends in a northwesterly direction on either side of the creek, covering an area of more than 1,200 acres and having a storage capacity, when

fully completed, of approximately 57,000 acre-feet. From this reservoir the waters will be discharged into the main channel of Willow Creek and carried to what is commonly known as "Reservoir No. 2," the dam of which is constructed across the main channel of Willow Creek at which point the waters stored in reservoir No. 3, and other waters flowing in the creek, are diverted to a canal running in a southeasterly direction from the dam on the westerly side of Willow Creek, with a capacity of 200 cubic feet per second. This canal, which continues in a southerly and southeasterly direction, divides into two branches, one of which is known as the "High Line Canal" with a carrying capacity of 50 cubic feet per second, and the other, known as the "Low Line Canal," continues in a southerly direction, with a capacity of 200 cubic feet per second to a reservoir known as "Pole Creek Reservoir." The works consist of flumes, siphons, canals, numerous laterals and service ditches for the purpose of distributing the waters to about 20,000 acres of land. This company has also constructed ditches and canals diverting the waters of Black Creek and Pole Creek. It also has a canal carrying the water from its Low Line canal to the head of what is commonly known as the "Lockett" or "Company Ditch."

29. The Eastern Oregon Land Company and the Lower Willow Creek Water Users' Association object to the sufficiency of the notice of appropriation by the Willow River Land & Irrigation Company, upon which the latter bases its rights to a considerable extent. In August, 1910, an amended notice was filed perfecting the former. Similar objections to this notice were urged before the United States courts for the district of Oregon in *Eastern Oregon Land Co.* v. *Willow River Land & Irr. Co.* (C. C.), 187 Fed. 466, and in the

same case on appeal before the Circuit Court of Appeals, 204 Fed. 516 (122 C. C. A. 636). The notice was held sufficient. It specifies the point of diversion, which it is claimed is not sufficiently specific, as the southwest quarter of the northwest quarter of section 27, when it should have been the southwest quarter of the southwest quarter of that section. The map in evidence shows that the only portion of section 27 crossed or approached by the creek is the southwest quarter of the southwest quarter, and that the southwest quarter of the northwest quarter of that section is nearly a half mile from the creek. This clearly indicates a clerical error. In the absence of any intervening right which had been prejudiced on account of such a defect we hold the notice to be sufficient.

30. It is also contended that the Willow River Land & Irrigation Company failed to comply with Section 6529, L. O. L., requiring a map to be filed, and that the general route of the ditch or canal as described in the notice was not followed in the construction of the canal. Subdivision 7 of Section 6595, L. O. L., provides:

"And where appropriations of water heretofore attempted have been undertaken in good faith, and the work of construction or improvement thereunder has been in good faith commenced and diligently prosecuted, such appropriations shall not be set aside or avoided, in proceedings under this act, because of any irregularity or insufficiency of the notice by law, or in the manner of posting, recording or publication thereof."

The informalities in the proceedings taken to appropriate the water of Willow Creek by the Willow River Land & Irrigation Company under the old law were

cured by the subdivision set forth above. We think it is shown by the testimony that the appropriations of water made by this company were undertaken in good faith, and that construction was commenced and diligently prosecuted. It is undisputed that the company expended about $1,200,000 on the irrigation system. The law of 1891, under which the proceedings by the Willow River Land & Irrigation Company were commenced, provides that the notice shall contain a general description of the course of the ditch or canal or flume, and that a map shall be filed showing the general route. This statute does not require the corporation in its notice of appropriation to fix upon a precise line upon which to construct its ditch or canal, but requires only a general description. It appears that changes were made on account of the grades in the line of the ditch. It, however, follows the general direction contained in the notice which is a substantial compliance with the statute. Such notices are liberally construed: *Osgood* v. *Water & Min. Co.*, 56 Cal. 571, 579. We fail to find that any other appropriation or location of a ditch has been made which conflicts with those in question, or that any intervening rights have been prejudiced in any way by a deviation in the line of canal from that mentioned in the notice.

31. The Willow River Land & Irrigation Company appeals and assigns as error the decree of the Circuit Court that an appropriator cannot, during the irrigation season, store water under his appropriation for beneficial use later in the season. The water board found and ordered:

"That in all cases where water is stored by any claimant herein, said water shall be taken at any season of the year for said storage according to the dates of relative priority, as herein set forth. * * "

We approve this finding, and it should be carried into effect. The Circuit Court decreed:

"After the irrigating season begins, it appears from the evidence that all of the natural flow of Willow Creek is demanded for irrigation of premises of the respective claimants of the water of said stream for irrigation; therefore the entire flow of Willow Creek after the irrigation season opens shall be used for irrigation purposes until the amount to which each user is entitled has been supplied according to his priority. Any surplus amount over the combined needs of the water users from this stream for irrigation during the irrigation season may be stored as surplus water."

This appellant complains that the above clause of the decree ignores the priority of right and is in conflict with the order of the board. We doubt if such was the intention of the trial court. In order to carry out the order of the board of control, this finding may be changed so as to be in substance as follows: The entire flow of Willow Creek after the irrigation season opens shall be used for irrigation purposes to the extent of the amount to which each user is entitled by a priority of right. Any surplus amount over the combined needs and use of the water users from this stream having a prior right for irrigation during the irrigation season may be stored as surplus water. This is in conformity with Section 6526, L. O. L., which provides that an irrigation company constructing a reservoir—

"shall have the right to take from any running stream in this state and store away any water not needed for immediate use by any person having a superior right thereto."

32. With this question are raised two others, namely: (1) Can the Willow River Company store during any part of the irrigating season the water to

which it is entitled under its early priorities, and use such water later in the same season to irrigate the lands to which the board of control decreed such water? In other words, can an appropriator store water he may not be able to use economically in February or March for use in July and August on the same land? (2) If the company has the right to store any part of the water which is decreed to it under these early rights, can it, with the consent of its water users, apply such stored water to the irrigation of any land under its canals, provided the amount so stored out of such appropriations, together with the amount used for direct irrigation under such appropriations without first being stored, does not aggregate more than 3 acre-feet per acre, based on the acreage to which such water was appurtenant under the decree, or on which such appropriations rest? In the arid states the principle is gaining ground "that the right to use the water for irrigation inheres in the land irrigated," and is inseparable therefrom or separable only with permission of the water board or like authority: Wiel on Water Rights (3 ed.), § 282. Indiscriminate changes should not be permitted, nor should a change be allowed which will injure the rights of others: Wiel, § 508. Section 6668, L. O. L., provides in part as follows:

"All water used in this state for irrigation purposes shall remain appurtenant to the land upon which it is used; provided, that if for any reason it should at any time become impracticable to beneficially or economically use water for the irrigation of any land to which the water is appurtenant, said right may be severed from said land, and simultaneously transferred, and become appurtenant to other land, without losing priority of right theretofore established, if such change can be made without detriment to existing

rights, on the approval of an application of the owner to the board of control.''

It is contended by this appellant that, by the board ordaining that ''the priorities herein confirmed confer no right to the use of the waters of said stream and its tributaries, on the lands other than those specific tracts to which such rights of appropriation are herein set forth as appurtenant,'' the statute of 1909 is thereby given such a construction as to divest the appellant of property rights acquired many years before. 2 Kinney on Irrigation & Water Rights, Section 768 (2 ed.), says:

''The owner may change the use of the water to any other beneficial use, so long as the change does not interfere with the vested rights of others.''

See, also, *Seven Lakes Reservoir Co.* v. *New Loveland & G. Irr. & Land Co.*, 40 Colo. 382, at page 384 (93 Pac. 485, at page 486, 17 L. R. A. (N. S.) 329). At page 331 of the last-named report, the court said:

''A priority to the use of water is a property right, which is the subject of purchase and sale, and its character and method of use may be changed, provided such change does not injuriously affect the rights of others.''

In *Wimer* v. *Simmons*, 27 Or. 1 (39 Pac. 6, 50 Am. St. Rep. 685), Mr. Justice WOLVERTON said:

''A valid appropriation having once been made of the water of a stream, it becomes a pertinent inquiry whether it is permissible to change the place of its use.   Undoubtedly there could be no objection to such change where it does not injuriously affect third parties. * * The doctrine that a prior appropriator for the purposes of irrigation may change the place of its use is recognized by this court in *Cole* v. *Logan*, 24 Or. 304, 313 (33 Pac. 568).''

It would seem that the main purpose of said portion of Section 6668 is to make provision for preserving the record of water rights which have been adjudicated, and require one changing the use to make an application therefor to the water board. Otherwise the record of adjudicated water rights would become confused and worthless. It is not the purport of this statute to divest anyone of a water right. The same effect should be given to the order of the water board.

It appears that it would be impracticable for the claimant at all times to use the amount of water awarded, by direct irrigation, without losing the benefit of its storage system to that extent. As long as no more water is taken from the stream than the claimant is entitled to at the time, and as it does not appear that it would be to the detriment of other existing rights, the application for such change for the purpose of storage should be approved. As conditions are liable to change, this approval is subject to its being shown to the water board at any time that such storage in any material way interferes with any prior right or injures any vested right: 1 Wiel, Water Rights (3 ed.), §§ 508, 511; Kinney, Irr., § 844.

The decree as to the claim of John Norwood and that of Clarence H. Oxman and Frank C. Oxman, Jr., we find is supported by the evidence, and the same is affirmed.

APPEAL OF MALHEUR IRRIGATION COMPANY, LIMITED.

33. The claim of this company is based substantially upon the following facts: In March, 1899, under the law then in force, one J. S. Stark filed on water rights in section 30, township 16 south, range 44 east, W. M., at Cow Valley, for storage and irrigation purposes, and also filed on Alkali Basin, Tubb Springs, and on

various other streams tributary to Willow Creek. He settled in Willow Creek Valley in 1881, and appears to have been the first to conceive the idea of storing the flood water of Willow Creek for irrigation purposes. With this in view, in 1898 he and his son employed a surveyor and made a preliminary examination of reservoir sites on Willow Creek and at Cow Valley. In the fall of that year he began actual construction work on the Cove Springs reservoir dam and at the Cow Valley reservoir site. He continued the work on the system until the spring of 1904, expending about $25,000, when the Malheur Irrigation Company, Limited, was organized and succeeded to his rights and holdings which they now own. The company began operations at once, and in order to build and operate the system worked upon the different parts thereof until the spring of 1905. Cove Springs reservoir was completed with a supply ditch 12 feet wide on the bottom, about three feet deep, and about 3½ miles long from Black Creek near which it enters Willow Creek to the reservoir. From the evidence the Circuit Court found the capacity of this reservoir to be 15,000 acre-feet. The company also partially constructed distributing ditches to carry water from the reservoir to lands to be irrigated, one of which is known as the "Mulkey Ditch" which is about 4 feet wide, 2 feet deep, and 8 miles long. The company expended approximately $87,000 on the system, making, with the amount spent by Stark and his associates, the sum of about $112,000. In the spring of 1905 the United States Reclamation Service, contemplating the construction of a project, withdrew a large area of land from entry in this valley, and served notice upon the officers of the company to cease the construction of ditches and reservoirs on government lands. After-

ward, the government apparently abandoned this project and restored the land to entry, but suspended final action upon the application for right of way over these lands until the Malheur Irrigation Company should condemn the water right through the lands of the Eastern Oregon Land Company. The latter company protested and resisted such application. Negotiations had theretofore been carried on with the Eastern Oregon Land Company for contemplated rights of way over its land and for the irrigation thereof, but were not completed, and in May, 1909, the Eastern Oregon Land Company procured an injunction in the United States Circuit Court for the District of Oregon, prohibiting the Malheur Irrigation Company from crossing its lands. This does not prevent the claimant from obtaining a right of way in the regular manner. The water board found: That during the years 1901, 1902, 1903 and 1904, the northwest quarter of section 10, township 17 south, range 44 east, W. M., was irrigated from this system. That during the years 1905 and 1906 the following lands were irrigated: The southeast quarter southeast quarter, section 6, the west half northwest quarter, the southwest quarter, and southwest quarter of southeast quarter of section 8, township 18 south, range 45 east, W. M.; lots 2, 3 and 4, section 30, township 15 south, range 43 east, W. M.; northeast quarter southeast quarter, west half southeast quarter, of section 10, township 17 south, range 14 east, W. M. That during the year 1907 the northeast quarter southeast quarter, and west half southeast quarter, section 10, township 17 south, range 44 east, W. M., and lots 2, 3, and 4 of section 30, township 15 south, range 43 east, W. M., were irrigated.

On or about the 12th day of June, 1905, one P. C. McKinney filed upon the waters of Willow Creek in

accordance with the law then in force, and the Malheur Irrigation Company, Limited, succeeded to whatever rights were gained thereby. On January 27, 1910, the Malheur Irrigation Company commenced a suit in the Circuit Court of the State of Oregon for Malheur County to condemn the right of way through the lands of the Eastern Oregon Land Company, which suit has been held in abeyance pending this determination.

The board of control found that:

"Since the year 1907 there has been no work performed upon said irrigation project nor any lands irrigated thereunder; that by reason of said injunction and failure to use the water for more than two years last past and by reason of not having lawful access to said stream to make such appropriation, the Malheur Irrigation Co., Limited, has forfeited and lost any and all rights to the waters of Willow Creek."

The Circuit Court approved this finding, and the claimant assigns the same as error. The proof shows that the Malheur Irrigation Company has a partially constructed storage reservoir at Cow Valley, consisting of a dam 23 feet high, 115 feet wide on the base, and 12 feet wide on top, and about 600 feet long. It contemplated constructing the reservoir to a height of 50 feet to store the flood waters therein for purposes of irrigation. The proof also shows that the Cove Springs reservoir, consisting of dams and a supply ditch from Black Creek near Willow Creek about 12 feet wide at the bottom and three feet deep, is completed, and that the service ditches leading from the same to Gum Creek, a distance of eight miles, are partially constructed.

34. We are unable to agree with the finding that this company had abandoned its right. The word

74 Or.—41

"abandon" is held in this connection to mean deserted or forsaken: *Dodge* v. *Marden,* 7 Or. 456; Kinney, Irr. (2 ed.), § 1101; *Oviatt* v. *Big Four Min. Co.,* 39 Or. 118 (65 Pac. 811). The intention of a party is a necessary element in abandonment. It therefore necessarily follows that there can be no abandonment of a *right* without some action of the will and an intent to abandon: *Wimer* v. *Simmons,* 27 Or. 1 (39 Pac. 6, 50 Am. St. Rep. 685); *Turner* v. *Cole,* 31 Or. 154 (49 Pac. 971); *Watts* v. *Spencer,* 51 Or. 262 (94 Pac. 39); *Hough* v. *Porter,* 51 Or. 318, 434 (95 Pac. 732, 98 Pac. 1083, 102 Pac. 728). To constitute an abandonment of water rights there must be a concurrence of the intention to abandon and an actual relinquishment of the property, or a concurrence of act and intent: *Hough* v. *Porter,* 51 Or. 318, 434 (95 Pac. 732, 98 Pac. 1083, 102 Pac. 728); 1 Cyc. 4.

35. The next question is whether or not this claimant has forfeited any right by nonuser. The right to the use of water cannot be deemed forfeited by a nonuser short of the period prescribed by the statute: *Dodge* v. *Marden,* 7 Or. 456.

36. It appears that ever since 1907 the Malheur Irrigation Company has been contending for the rights herein claimed. In considering the question of abandonment, the matter of the injunction, the delay caused in obtaining a right of way over government lands and other lands, and litigation in regard to a right of way should be taken into consideration. The cessation of work on the project was not voluntary. It does not appear that there was an intent to abandon: *Hough* v. *Porter,* 51 Or. 435 (95 Pac. 732, 98 Pac. 1083, 102 Pac. 728). The company made an application to the state engineer for a permit to appropriate water, but the application has never been acted upon.

It is in evidence that the officers of this company, in considering Section 66 of the act of 1909, which provides that "it shall also be a misdemeanor to use, store, or divert any water until after the issuance of the permit to appropriate such waters," decided that they had no lawful right to proceed until such permit was granted. We think that this claim should be disposed of under the provisions of subdivisions 3 and 5 of Section 70 of the Water Code, the first of which is as follows:

"And where any riparian proprietor, or under authority of any riparian proprietor or his or its predecessor in interest, any person or corporation shall, at the time this act is filed in the office of the Secretary of State, be engaged in good faith in the construction of works for the application of water to a beneficial use, the right to take and use such water shall be deemed vested in such riparian proprietor; provided, such works shall be completed and said water devoted to a beneficial use within a reasonable time after the passage of this act. The board of control, in the manner hereinafter provided, shall have power and authority to determine the time within which such water shall be devoted to a beneficial use. The right to water shall be limited to the quantity actually applied to a beneficial use within the time so fixed by the board of control."

Subdivision 5 provides:

"Nor shall the right of any person, association or corporation, to take and use water be impaired or affected by any of the provisions of this act where appropriations have been initiated prior to the filing of this act in the office of the Secretary of State, and such appropriators, their heirs, successors or assigns, shall, in good faith and in compliance with laws existing at the time of filing this act in the office of the Secretary of State, commence the construction of works for the application of the water so appropriated to a

beneficial use, and thereafter prosecute such work diligently and continuously to completion, but all such rights shall be adjudicated in the manner provided in this act.''

37. It is well known that irrigation ditches and railroads are frequently constructed prior to the time of obtaining a right of way therefor. A delay caused by litigation and efforts by an irrigation company to obtain a right of way for irrigation ditches and reservoirs is not a ground for forfeiture of its rights: *Pringle Falls Power Co.* v. *Patterson,* 65 Or. 474 (128 Pac. 820, 132 Pac. 527). Such proceedings, instead of showing an abandonment, indicate that the company is fighting for the purpose of carrying forward the project. For some time the Malheur Irrigation Company, Limited, acted in harmony with the Eastern Oregon Land Company and expected its assistance. J. S. Stark, the predecessor of the Malheur Irrigation Company and the original promoter of the project, filed upon a water right under the old law, and indicated his good faith in the undertaking by doing substantial work and expending a considerable sum of money, in fact all that he had. The Malheur Irrigation Company succeeded to the rights of Stark and his associates, and was engaged in good faith in the construction of the works for the application of water appropriated to a beneficial use at the time the Water Code was enacted, and is protected by this act of 1909. The work was diligently and continuously prosecuted within the purport of subdivision 5 of Section 70. The right had been initiated prior to the passage of the act. The amount of water that can be applied to a beneficial use cannot now be definitely determined, therefore this claimant should be allowed a reasonable time for the application of the water appropriated to

such use.   Subdivision 6 of Section 70 directs that in determining such time the board—

"shall grant a reasonable time after the construction of the works, or canal, or ditch, used for the diversion of the water, and in doing so shall take into consideration the cost of the appropriation and application of such water to a beneficial purpose, the good faith of the appropriator, the market for water or power to be supplied, the present demands therefor, and the income or use that may be required to provide fair and reasonable returns upon the investment.   Upon making such order the board of control shall direct the state engineer to issue a certificate showing such determination.   For good cause shown the board of control may extend the time by granting further certificates."

All matters considered, we deem five years from the date of entry of the decree herein in the lower court to be a reasonable time for such purpose; and this is allowed.   The Malheur Irrigation Company, Limited, appealed from the decree only in so far as it affects the Willow River Land & Irrigation Company and the Eastern Oregon Land Company; therefore the decree upon this appeal as to the rights of the Malheur Irrigation Company, Limited, will not change or affect any of the rights of the other claimants.

## CLAIM OF T. J. BROSNAN.

38. The order of determination of the board of control as confirmed by the Circuit Court in regard to the water rights of T. J. Brosnan is affirmed, except as to the following lands: The record shows that Brosnan holds under a lease from the Eastern Oregon Land Company for which he was decreed a water right to the north half of the northwest quarter and the southeast quarter of the northwest quarter and the

northwest quarter of the southeast quarter in section 23, township 17 south, range 44 east, W. M. We deem it unnecessary that an award of this water right should be made to the lessee. Instead, the right should be recorded in the name of the owner of the land, which appears to have been done. This part of the decree in favor of Brosnan as to the land of the Eastern Oregon Land Company will therefore be eliminated.

39. It is contended by the appellant Willow River Land & Irrigation Company et al., that the state engineer's maps do not show that Mr. Brosnan has applied water to a beneficial use. The controversy in regard to this claim, like many others, arises on account of the manner of irrigating in former years. Mr. F. M. Hammer testified in regard to this claim in effect that he formerly owned the Brosnan land, and that he had known it since 1864, when one Reaves was in possession; that there was a ditch on the northeast side at that time; that he purchased the place or the improvements in 1870, and was in possession until 1877; that in 1871 he dug a ditch thereon in a northeasterly direction for about one fourth of a mile, and connected with the slough at that point; that he put water into the ditch and threw it out upon the land by means of dams. Mr. Brosnan irrigated the land in a crude way, in vogue at that time, and cut about 150 tons of hay therefrom, which amount has increased so that lately he cuts about 400 tons. The water was used for a beneficial purpose. It is objected by the appellant that Mr. Brosnan, prior to the commencement of these proceedings, did not claim a superior right to the water as against the appropriators above him on the stream, and some witnesses testified to the fact that they did not see any ditch

on his premises. This fact is easily explained when we know that a ditch was dug to connect with the slough, a method approved at that time, and no doubt the part of the ditch that was dug resembled the slough at the time the witnesses described it. Mr. G. S. Johnson testified (Test. Bk. A, p. 498) that he bought this land in 1883 or 1884; that he lived there, and that he irrigated it for two or three months during the summer; that in 1885 or 1886 he sold it to Brosnan The claimant T. J. Brosnan testified that he had known the land since 1880; that he bought the place in 1887 and lived on the land from that time until 1896; that the premises had been irrigated from the waters of Willow Creek every year since 1880; that up to the last two or three years he had had plenty of water, but since that time not sufficient to raise good crops; that the old Reaves ditch had been used in taking water from Willow Creek and distributing it upon these lands; that there is a dam in Willow Creek to divert the water into the Hammer ditch, and that below this there are three other dams used to throw the waters of Willow Creek out upon the premises.

40. While the crude and wasteful manner of irrigating must be replaced by modern, economical methods, yet the ancient means used for applying the water is not a reason for forfeiting the right to a sufficient amount of water to irrigate the land in a proper manner. The excess over the amount necessary for proper irrigation by the claimant should be allowed to be used by someone else. Time and space will not permit a detailed statement of the evidence upon all the material questions. The testimony, like that in many cases in regard to the use of water in early days, is necessarily somewhat indefinite. We think the evi-

dence supports the findings as to Mr. Brosnan's claim. The awards made by the findings and decree as to A. S. Field and J. A. Hoskins are also supported by the evidence and are affirmed.

## Claim of J. T. Logan.

41. Mr. Logan claims water for 17 acres in the southwest quarter of the southwest quarter of section 13, township 15 south, range 42 east, W. M. The water board awarded water for that amount, and the decree is modified to conform to the order of the board. The Circuit Court increased the amount of the irrigated area in this tract from 17 to 37 acres. The records shows that Mr. Logan's mother, Nancy J. Logan, by her statement, claimed 20 acres in this subdivision and was awarded water therefor. There being two awards for the same 20 acres, a correction should be made. The decree as to the remainder of the award to J. T. Logan is affirmed.

## Claim of Frank O'Neill.

The evidence shows that 150 or 160 acres of the land of this claimant have been irrigated by flooding for hay and pasture in much the same manner as the land of other claimants has been irrigated. The board awarded to this claimant water for 144 acres, which order the Circuit Court confirmed. The ward is supported by the evidence and is affirmed.

## Claim of W. J. Scott.

42. It is suggested that there is an error in the description of a portion of the land of this claimant, namely, the southeast quarter of the southwest quarter of section 30, township 16 south, range 44 east, the range being given in the decree as 43 east, instead of 44 east. This should be corrected. As we understand

the record, the court increased the area for which water was allowed in this subdivision, or intended so to do, by adding 10 acres thereto. The testimony of the claimant in regard to this subdivision is as follows (Test. Bk. A, p. 790):

"Q. Are you the owner of the southeast quarter of the southwest quarter of section 30, township 16 south, range 44 east?

"A. Yes, sir.

"Q. It that 40 irrigated?

"A. Yes, sir.

"Q. How much of it?

"A. About all of it.

"Q. The state engineer's survey shows that there are 32 acres irrigated from that 40. State whether or not there is more than 32 acres irrigated in that 40, if you know.

"A. I thought there was; the creek cuts a little, but I didn't think it cut out so much."

The record also shows the following (Test. Bk. A, p. 814):

"(Mr. Rand.) We will ask at this time that the statement and proof of claimant W. J. Scott be amended so as to include the southeast quarter of the southwest quarter of section 30, township 16 south, range 44 east, W. M., which 40 acres was left out from the statement by inadvertence, and which is shown by this witness to be his land, and the state engineer's map shows that 32 acres of that land is irrigated by Mr. Scott under his ditch."

As we understand the purport of this record, by accepting the statement of the engineer's map, Mr. Scott's claim as to this subdivision is made for 32 acres in this 40-acre tract. The engineer's survey of the amount irrigated should outweigh the guess made by the claimant. The decree will therefore be modified so as to award water for 32 acres in the southeast

quarter of the southwest quarter of section 30, township 16 south, range 44 east, W. M. The award made by the decree to this claimant in other respects is affirmed.

## CLAIM OF D. F. BOGGS.

43. This appellant claims that he should be adjudged a priority for his water right as of 1873, instead of 1882, for the reason that the land and water right were purchased of Patrick Faulkner whose right dated from 1873. It appears from the evidence that Lawrence Faulkner and Patrick Faulkner, who were brothers, made an appropriation and constructed a ditch in 1873. Patrick Faulkner testified, in substance, that the water was first applied on the land sold by him to D. F. Boggs, which was known as the "Donohue land," in 1881 or 1882, and that he used the water on the Bogg's homestead for 11 years. It appear that it was sold to Boggs in 1906. This appellant contends that an appropriator is entitled to a reasonable time after a diversion of water in which to carry the water to the place of use and make the actual application for the contemplated useful purpose, citing *Nevada Ditch Co.* v. *Bennett,* 30 Or. 59 (45 Pac. 472, 60 Am. St. Rep. 777), and other cases. As will be seen from the evidence referred to, it does not appear that it was contemplated to use the water upon the Donohue land until about 1882. This appears to be a new appropriation, and it is not shown to be a part of the appropriation made by the Faulkners in 1873. Lawrence Faulkner and Patrick Faulkner made an appropriation for their land about 1873, but as we understand the record Patrick Faulkner did not own the Donohue land until several years thereafter, and no appropriation was made for this land until about 1882.

The finding of the board of control and the Circuit Court in this respect is therefore affirmed.

Lower Willow Creek Water Users' Association.

44. This is an Oregon corporation, organized on April 10, 1908, as a co-operative association for the purpose of storing water. It was organized largely for the purpose of dealing with the Co-operative Christian Federation Trust, which had purchased certain options and water filing of Don Carlos Boyd. On May 10, 1906, Don Carlos Boyd filed in the office of the county clerk of Malheur County a notice of water right, claiming 50,000 acre-feet of water, to which water right the Lower Willow Creek Water Users' Association subsequently acquired title. On July 27, 1909, the association filed with the state engineer its application for a permit to construct two reservoirs, and to store the unappropriated water of Willow Creek. On February 23, 1910, the association filed with the state engineer its application for a permit to appropriate the water. These applications have not yet been acted upon. The association claims that in July, 1908, the preliminary work was begun, including the surveying necessary for its project, but that no actual construction was ever made. The water board and the Circuit Court found in effect that no construction work had ever been done by this company, that no right of way had ever been obtained by it, and that it had no rights to water for adjudication by the board. The previous filing of Don Carlos Boyd, as it passed through the Federation Trust into the hands of the Water Users' Association, had been permitted to lapse for failure to commence active construction or continue the same with reasonable diligence. As the right of this association could not date earlier than July 27,

1909, the day of its application for a permit to store the waters, and since the appropriation of the Willow River Land & Irrigation Company of the date of April 7, 1908, has been held valid, and since this appropriation would cover the surplus waters flowing in Willow Creek during each and every season, the refusal of the board to grant the permit of the association was therefore proper and should be sustained. These findings are supported by the evidence and are affirmed.

45. It is urged that the Circuit Court erred in changing the priority of M. G. and I. W. Hope from 1905 to 1904 for 18.5 cubic feet per second from Turner Creek for the irrigation of 1,480 acres, and in changing the priority of appellant Willow River Land & Irrigation Company from 1898 to 1904 for two second-feet from Turner Creek through the Dougherty Ditch. The evidence in regard to the date of relative priority of appellant Willow River Land & Irrigation Company as to the Dougherty right is based on the testimony of Leonard Cole, a witness for that company, who testified, in substance, that Dougherty used water on the land when he first went there; that he does not remember the year, but thinks it was at least 12 years ago. It appears that Dougherty was absent from the land for some time after he first went there. This probably rendered it difficult for Mr. Cole to remember the date of Dougherty's settlement. Cole further testified that he thought Dougherty used water out of Poison Gulch and Turner Gulch, with ditches from both streams, but that he only noticed a ditch from Turner Gulch.

It is contended that the certificate of the register of the United States Land Office is proof that Dougherty was in possession of these lands as early as 1902. To this we are not willing to accede. It is a well-known

fact that an entry or filing in the United States Land Office made for land is not proof of settlement or possession. The evidence of Leonard Cole is indefinite and uncertain as to the date of Dougherty's possession and appropriation. It appears that Dougherty was away from the land for a considerable time after he made an entry therefor. As to the date of relative priority, I. W. Hope testified, in substance, that he filed a claim for the water of Kern Creek for M. G. Hope and I. W. Hope. It appears that the water board awarded M. G. and I. W. Hope 18.5 cubic feet per second of water for the irrigation of 1,480 acres of land, with the relative priority of 1905, the water to be taken from Turner, Spring Branch, Sheep Corral and Current or Kern Creeks, with the privilege of storage of water from all of said creeks except the first. It appears that the land of the Hope brothers has nearly all been irrigated; that the construction of ditches for this purpose was begun in 1903 and completed in 1904 and 1905; that the water has been applied for the purpose of irrigating grain and alfalfa. There seems to be no question raised but that this appropriation was made in good faith and the water applied for a beneficial purpose. We think the trial court was justified in fixing the date of relative priority as of 1904.

The Willow River Land & Irrigation Company complains that this change in the date will compel it to prorate with the award to Hope brothers for this amount of water from Turner Creek. In the description of this water right the Circuit Court dealt only with the date, and referred to the award as being for the irrigation of 1,480 acres of land from Turner Creek, without mentioning the other streams named above. We do not understand that it was intended that all the water should be taken from Turner Creek.

It is in evidence that a large part of this land is irrigated from Kern Creek. Only an equitable amount should be required to be taken from Turner Creek, such amount to be apportioned as nearly as may be according to the amount heretofore used from the respective creeks. While the record is not in a condition to enable us to fix the amount definitely, we think the matter can be safely left to the water-master under the direction of the water board.

46. The decree as to the awards to C. T. Locey, J. P. Smith, S. M. Molthan, Ernest Locey, G. E. Rutherford, David K. Worsham, Florence E. Woodcock, C. C. Crews, A. J. Howard, N. D. Kelley and Estate of Warren D. Springer is affirmed. Each water right herein awarded, decreed or affirmed is subject to the conditions, changes and modifications suggested in this opinion. The water of the various water users, the rights to which are adjudicated herein, should be measured at the headgate or intake of each water user's lateral or service ditch.

47. The waters from Burnt River which are deposited in Willow Creek through the Eldorado Ditch near the Morfitt place and afterward used by the Eastern Oregon Land Company should be measured at the place where such waters are usually emptied into Willow Creek, the place of measurement to be changed only by the water-master on authority of the water board.

48. It is apparent that in a proceeding of this kind in describing the various tracts of land, water rights, and dates of priority clerical errors are sure to occur. Some of these were rectified by the trial court, and we have endeavored to correct others. It is also quite likely that other mistakes may occur. We deem it essential that all clerical errors be corrected by the board upon

its original records. This should be done in such a way as to show the correction made, and by what authority. For this purpose and to that extent these proceedings are referred to the water board with authority to correct any clerical errors that may be found within three months from the date of entry of the final decree herein in the lower court.

After a careful examination of the evidence the decree of the lower court, with the modifications and changes herein suggested, is affirmed; each party to this proceeding to pay his own costs.

MODIFIED AND AFFIRMED.

FURTHER MODIFIED ON REHEARING.

Modified February 16, 1915.

ON REHEARING.

(146 Pac. 475.)

On rehearing, briefs were submitted by *Mr. Robert M. Duncan, Mr. John R. Wheeler, Messrs. Teal, Minor & Winfree* and *Mr. John W. McCulloch,* with oral arguments by *Mr. Duncan, Mr. Wirt Minor* and *Mr. McCulloch.*

In Banc.    MR. JUSTICE BEAN delivered the opinion of the court.

49. In regard to the date of relative priority of the company or Lockett Ditch of the claimant Willow River Land & Irrigation Company which was reserved for further consideration, we note that in its statement and proof the years 1872, 1873 and 1874 are the dates given when the water was first used for irrigation from the above ditch and others. In the statement of

the enlargements and completion of the ditch we find the following:

"The waters were appropriated in 1876 in said ditch covering about 40 acres of land. The second year it was increased to 80 acres, and the third year was completed to its present capacity, which supplied water for 11 claimants, and consisted of 50 shares. * * "

This, taken in connection with the main statement, evidently refers to the extension of the ditch beyond Phipps Creek.

Mr. Wm. Boswell, a witness for the Willow River Land & Irrigation Company, testified (Book B, p. 79) to the effect that he surveyed the company or Lockett Ditch in the fall or winter of 1873 for the purpose of draining swamp land of Joseph Cole, who also had land to be irrigated; that they got the water through to Phipps Creek the next season; that three or four years afterward it was extended and a number of farmers used the ditch from which to irrigate. Mr. C. E. Boswell, witness for claimant, testified (Book B, p. 468) that he had known the ditch since 1873, and that it had been used since that time; that he had followed it down a distance in going to a neighbor's house. Mr. Leonard Cole, witness for plaintiff, who settled in the valley in 1872, testified (Book B, p. 429 et seq.), in substance, that the company ditch was constructed below Cole's Ditch; that it was started about 1872, completed about halfway down in 1873, and extended and completed in 1877. It was shown on cross-examination that in 1891, in the case of *Cole and Kendall* v. *Logan,* Cole testified as follows:

"Q. What, if anything, do you know about a company or corporation ditch—ditch being taken out of Willow Creek and located upon Logan's homestead?

"A. In the year 1877 there was a ditch taken out on Logan's homestead. It was a company or corporation ditch. * *

"Q. What year was it built in?

"A. 1877."

The witness did not then testify that the work was commenced in 1872 or 1873. He stated that the ditch concerning which he testified was the same as the one now referred to as the company or Lockett Ditch. Mr. C. M. Foster, a civil engineer of Baker, testified (Book B, p. 526) that he saw them working on the company ditch near the head or lower down the valley, he thought, about 1874. W. R. Lofton testified (Book B, p. 482) that his father settled on the creek in 1875, and he became acquainted with the company ditch at that time; that the water ran down to Phipps Creek, then down that creek, and was taken out below; that his father while there irrigated 75 or 80 acres on the Nick Olk place; that he moved away in 1878, and the next year or so the ditch was extended below Phipps Creek. C. D. Davis, witness on the other side, testified (Book A, p. 938) to the effect that he lived on land now covered by the ditch in 1876 and 1877, and that he thought the ditch was constructed part way in the latter year; that 25 or 30 acres were irrigated from the lower ditch, and the amount was increased from year to year. Mr. J. T. Logan, who appears to be acquainted with the early settlement of the valley, testified (Book A, p. 945) that the company ditch was constructed in 1877 or 1878, and finished from Phipps Creek on down in 1883. It therefore appears that some of the witnesses, in referring to the company or Lockett Ditch, have in mind the construction of the ditch from the Logan place to Phipps Creek, and others

74 Or.—42

from Phipps Creek on beyond. The places in the valley down below the Cole and Logan farms seem to have been settled upon later than those named. It appears that the settlement in this vicinity proceeded from the places mentioned on down the valley. Mr. W. J. Scott, who came to the creek in 1878, states that the company ditch was then down to Phipps Creek, and about 80 acres were irrigated. It is stipulated that the ditch was made from Phipps Creek down in 1882, but there was a lower ditch to which testimony had already been given. A careful re-examination of the evidence leads us to believe that the company or Lockett Ditch was commenced and constructed to Phipps Creek in 1873; that from 60 to 100 acres were irrigated therefrom; and that when this ditch was started several of the quarter sections of land beyond Phipps Creek had not been settled upon, or had only a small cabin thereon without the land being improved. It does not appear that the appropriation was at first made for unoccupied land, or for that farther down the valley than Phipps Creek. Subsequently, and not earlier than 1877, the ditch was taken out of Phipps Creek about one quarter of a mile below where the company ditch emptied into that stream and constructed beyond. It was afterward placed upon higher ground and extended. We therefore conclude that the lands served from the company or Lockett Ditch between the intake thereof to Phipps Creek are entitled to a date of relative priority of 1873, and the lands served from the extension thereof beyond Phipps Creek are entitled to a date of relative priority of 1877, each of these subdivisions of land to be tabulated by the water board.

MALHEUR IRRIGATION COMPANY, LIMITED.

50. R. C. McKinney made a filing June 10, 1906, on what is known as the Beers reservoir site. Notice of the appropriation of 25,000 cubic-feet per second of the flood waters of Willow Creek was filed in the office of the state engineer, posted at 'the proposed point of diversion on Willow Creek, and recorded in the records of water rights in Malheur County. (Exhibit No. 65, Book 4; Testimony, Book A, p. 870.) By deed of July 1, 1907, filed for record in that county July 26, 1908, McKinney conveyed all his rights by virtue of such notice of appropriation to the Malheur Irrigation Company. The company made a filing March 1, 1906, on the same site as the Beers reservoir. The Willow River Land & Irrigation Company initiated its rights by filing a notice of appropriation on April 7, 1908. It is contended by this company that the filings made upon the Beers reservoir site have been abandoned, and should be canceled.

The act of 1905 (Section 6625, L. O. L.) under the provisions of which R. C. McKinney and the Malheur Irrigation Company filed upon the Beers reservoir site, is, in effect, an amendment of the act of 1891 (Section 4993 et seq., B. & C. Comp.). The later act enlarged the scope of the former, and granted to persons, as well as to corporations, the privilege of appropriating water by posting and recording a notice and making application to the state engineer. Section 6533, L. O. L., which was repealed in 1913 (Laws 1913, p. 138), provided that a corporation proposing to appropriate water should commence the actual construction of its proposed ditch or canal within six months from the date of the posting of the notice prescribed, and should prosecute the same without intermission (except as resulting from the act of God, the elements,

or unavoidable casualty), until the same should be completed; that the actual capacity of the ditch or canal, when completed, should determine the extent of the appropriation; and that upon a compliance with the act the right to the use of the water appropriated should relate back to the date of posting the notice. Section 6546 states that the right to appropriate water may be lost by abandonment or neglect to use the same for a period of one year, but that the question of abandonment shall be one of fact to be tried and determined as other questions of fact. Under the present Water Code, by Section 6630, L. O. L., as amended by the Laws of 1913, page 277, it is provided that actual construction work shall begin within one year from the date of approval of the application and the construction of any proposed irrigation or other work shall thereafter be prosecuted with reasonable diligence, and be completed within a reasonable time as fixed in the permit, not to exceed five years from the date of such approval. Provision is made for an extension of time for good cause shown.

The statement of contest of the Willow River Land & Irrigation Company, so far as the same relates to the claim of the Malheur Irrigation Company, is a general one to the effect that the latter company has no right or claim to the use of the water of Willow Creek; that its claim is unfounded, false and fictitious. No reference is made to the filings in question or to the abandonment by the Malheur Irrigation Company. It is clear that abandonment does not take place, as a matter of law, without a trial of the facts. The water board disallowed the claim of the Malheur Irrigation Company, and that company filed exceptions in the Circuit Court upon the ground that the finding that it had forfeited and lost all rights to the waters of

Willow Creek was not warranted or supported by the facts and was contrary to law and equity. The Circuit Court found adversely to the exceptor, and the company appeals therefrom.

51. It is urged upon rehearing by counsel for the Willow River Land & Irrigation Company that the R. C. McKinney filing was never a part of the Malheur Irrigation Company system, for the reason that the deed of July 1, 1907, conveying the same to the company, was not recorded until July 26, 1908, after the Willow River Land & Irrigation Company had initiated its rights; that the construction work done under this filing was not sufficient to apprise the subsequent appropriator that the appropriation made by McKinney was being kept intact. The recording of the conveyance to the Malheur Irrigation Company would serve only to inform intending appropriators of the ownership thereof. The record of the notice of appropriation standing in the name of R. C. McKinney was notice, so far as such would impart information, that a right was claimed. We fail to see why one contemplating to make an appropriation from this stream should not heed the notice in the name of McKinney just as much as he would if the record had shown that the right was claimed by the Malheur Irrigation Company. McKinney was a stockholder and director in the company at the time he made the filing. He and Mr. Hoskins, who operated with him, after completing the survey of the Beers reservoir site in 1907, dug trenches for the reservoir dam, and, it is claimed, expended about $1,100 or $1,200. Mr. C. E. Brainard, at page 899, Book A, evidence, states as follows:

"I never knew the exact amount that was spent by them; I have been there and saw the work, and knew

that there was trenches dug there, and that there was holes sunk down, but I never knew the exact amount that was done there.''

At page 887 et seq., Book A, we find the following evidence:

''Q. Mr. Brainard, I will call your attention to instruments Nos. 48 and 50 of Exhibit No. 43, being the water notice of filing and water appropriation of R. C. McKinney and the transfer to the Malheur Irrigation Company, Limited, and ask you what, if anything, your company has done to keep that appropriation, in making that appropriation good, and keeping your rights intact.

''A. There was quite a little work done there in the fall of 1907, 1908, and I am not sure about 1909; there might have been some work done there in 1909, but not to any great extent; simply work enough to protect any right the company might have in that locality.

''Q. Then that notice of location of the reservoir site is what has been known throughout this hearing as the Beers reservoir site?

''A. Yes, sir. * *

''Q. At the present time, Mr. Brainard, is that reservoir site and storage plant a part of your irrigation system?

''A. Yes, sir.   When the original survey of the Malheur system was made a line was run from the upper end of Cow Valley into the South Fork of Willow Creek, and after figuring estimates of construction and the obstacles to be overcome, it was decided to be too expensive, and the company acquired this McKinney right and filing, anticipating making what they call the main storage reservoir, and it has been considered as a part of the system.

''Q. And this at the present time you consider your principal reservoir for the storage of flood water?

''A. We do.

''Q. In reference to that matter I will ask you if Mr. R. C. McKinney made application to the govern-

ment or Department of the Interior for a right of way for that reservoir?

"A. He did.

"Q. And that right of way and the different steps taken through the land office is the same that are evidenced by Exhibit No. 52, hereto introduced, and consisting of a letter, notice of suspension of action on the application of right of way of R. C. McKinney, the further notice of the department requiring the water rights to be furnished, which was to consist of the certificate of the state engineer as to the rights, and the third being a copy of the order of the department transmitting the map and the field-notes, same being approved and the order granting the right of way?

"A. It is.

"Q. Mr. Brainard, I will ask if your reason for doing no further work on that particular unit of your system is caused by the same disability that has prevented you from working on the other portion of your system?

"A. That question came up at a directors' meeting of the Malheur Irrigation Company, and the best advice they got relative to the company was that the permanent injunction would restrain them from taking any measure or doing any work on Willow Creek, and that, of course, stopped work on that site.

"Q. And you have been holding the work on this particular reservoir si⁺e in abeyance, pending the further action on that injunction?

"A. We have."

52. Further work was suspended on account of an injunction and delay in obtaining the right of way. The evidence in regard to this matter is somewhat general. It does not appear to have been seriously questioned at the time it was given. At the time of making its filing, the Willow River Land & Irrigation Company had constructive notice of the claim now made by the Malheur Irrigation Company, and it would

seem that an inspection of the Beers reservoir site
would have informed the people interested what work
had been done on the dam indicating that the ap-
propriation had not been abandoned, and that vested
rights had accrued. The Willow River Land & Ir-
rigation Company people seem to have ignored every
obstacle, and to have determined to proceed and take
any chances there might be of adverse consequences.
From all that appears in the record we do not think
that the McKinney or the Malheur Irrigation Com-
pany abandoned the right conferred by virtue of these
filings. Abandonment, as applied to a water appro-
priation, is a voluntary relinquishment of a known
right. To constitute abandonment there must be a
concurrence of the acts and intent. The mere inten-
tion to abandon, if not coupled with yielding up pos-
session, or the cessation of use, is not sufficient; nor
will nonuse alone, without an intention to abandon,
be held to amount to an abandonment: *Oviatt* v. *Big
Four Min. Co.*, 39 Or. 118 (65 Pac. 811) ; 1 Wiel, Water
Rights (3 ed.), §§ 567, 576; *Hough* v. *Porter,* 51 Or.
435 (95 Pac. 732, 98 Pac. 1083, 102 Pac. 728).

53. The reason for the cancellation of the McKin-
ney filing earnestly urged by counsel for the Willow
River Land & Irrigation Company is largely one of
expediency and that such action will greatly accelerate
the development of the country. The Water Code
authorizes the state engineer, in passing upon applica-
tions, to take into consideration the public welfare.
This should not be carried to the extent of effacing
vested rights. In view of all the conditions, in order
to both protect the rights of the claimants and as a
safeguard against retarding the development of the
section of country affected, we see no reason why the
construction of the proposed works on the Beers reser-

voir site should not be commenced in good faith within six months from this date, and prosecuted with reasonable diligence to completion not later than January 1, 1918, unless for good cause shown such time should be extended.

54. Counsel for the Willow River Land & Irrigation Company, upon rehearing, request that the rights of the Malheur Irrigation Company be defined more specifically and the dates of relative priority of the various rights be fixed. In *Pringle Falls Power Co.* v. *Patterson,* 65 Or. 474, 483 (128 Pac. 820, 132 Pac. 527), we had occasion to consider a water right initiated by posting notices of appropriation and the commencement of the construction of works not then completed. We there stated that the extent of the right that might eventually be obtained could not then be determined. So, in the case at bar, the final measurement of the appropriation of the claimant Malheur Irrigation Company will be the amount of water applied to a beneficial use. To constitute a valid appropriation of water three elements must always exist: (1) An intent to apply the water to some beneficial use existing at the time or contemplated in the future; (2) a diversion from the natural channel by means of a ditch, channel or other structure; and (3) the application of it within a reasonable time to some useful purpose: *Low* v. *Rizor,* 25 Or. 551, 557 (37 Pac. 82); *Nevada Ditch Co.* v. *Bennett,* 30 Or. 59 (45 Pac. 472, 60 Am. St. Rep. 777).

As we understand the record, the contracts of the Malheur Irrigation Company for supplying water for irrigation have not all been executed, and the works have not yet been completed. Whether the rights will relate back to the time of notice of appropriation will depend upon the diligence manifested in the prosecu-

tion and completion of the works. To pass upon the ultimate extent or date of relative priority of the right of appropriation which may or may not be perfected in the future would be to render a decision in advance of the transaction involved. This phase of the case, therefore, should be left for future determination by the water board, as the water is applied to a beneficial use. We are still without much light on the question as to the time to be allowed the Malheur Irrigation Company for the completion of its system and the application of the water to a beneficial use. As the board allowed the Willow River Land & Irrigation Company until January 1, 1918, it is probable that the same date will give the Malheur Irrigation Company sufficient time. Therefore our former opinion will be changed so as to grant until that date for the completion of the works and the application of the water.

With these modifications, we adhere to our former opinion.

FORMER OPINION MODIFIED ON REHEARING.